IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA DEMOCRATIC PARTY; CUMBERLAND COUNTY DEMOCRATIC PARTY; DURHAM COUNTY DEMOCRATIC PARTY; FORSYTH COUNTY DEMOCRATIC PARTY; GUILFORD COUNTY DEMOCRATIC PARTY; MECKLENBURG COUNTY DEMOCRATIC PARTY; ORANGE COUNTY DEMOCRATIC PARTY; and WAKE COUNTY DEMOCRATIC PARTY, | |
| Plaintiffs, | |
| v. | |
| PHILLIP E. BERGER, in his official capacity as PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE; TIMOTHY K. MOORE, in his official capacity as SPEAKER OF THE NORTH CAROLINA HOUSE OF REPRESENTATIVES; THE STATE OF NORTH CAROLINA; THE NORTH CAROLINA BIPARTISAN STATE BOARD OF ELECTIONS AND ETHICS ENFORCEMENT; and KIMBERLY STRACH, in her official capacity as EXECUTIVE DIRECTOR OF THE NORTH CAROLINA BIPARTISAN STATE BOARD OF ELECTIONS AND ETHICS ENFORCEMENT, | CIVIL ACTION NO. 1:17-cv-1113 |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs submit this memorandum in support of their motion for a preliminary injunction restoring the *status quo ante litem* by enjoining Defendants from enforcing an unconstitutional law eliminating primaries for judicial elections in 2018.

## FACTS

Primary elections are essential to the exercise of the constitutionally-protected associational rights of Plaintiffs political parties, and their members. As Wayne Goodwin, Chair of the North Carolina Democratic Party ("NCDP") has explained:

> Primaries are essential to the accomplishment of the purposes for which the NCDP, and all other political parties, exist. It is the mechanism by which the members of political parties, including the members of the NCDP, select the standard bearers in partisan elections who will best represent their principles and preferences at the general elections. Without primaries, political parties lose the compass they rely on to advance the collective interests and goals of their members. Primary elections give direction to political parties as to the collective will of party members, and determine not only the preferred candidates a party like NCDP has for the general election but also impact the agenda and message of the NCDP heading into the general election.

Declaration of G. Wayne Goodwin ("Goodwin Decl.") ¶ 10. Primary elections also serve multiple purposes vital to the preservation of our democracy, and the absence of primaries for judicial elections in 2018 will damage our State. As retired Wake County Senior Resident Superior Court Judge Donald Stephens has explained:

> Based upon my own experiences in five judicial elections spanning 32 years, the absence of primaries in 2018 judicial elections will, in my opinion, significantly deprive voters of their best opportunity to learn about the essential qualifications of each candidate for those seats and will deprive each candidate of an important means for advancing their

2

candidacy. The public will be delayed in learning about who has filed for judicial office until after the primary election is over and will have far less time to evaluate those judicial candidates who file before the general election.

More importantly, the absence of judicial primaries will pose a risk that the best qualified candidates will not be elected by a well-informed citizenry and that winning candidates will take office in an election in which they did not receive a majority vote to hold such high public office. Such a result will undermine democratic principles and greatly weaken the quality and integrity of the judicial branch of government.

Declaration of Donald Stephens ("Stephens Decl.") ¶¶ 20-21. Additionally, as retired

North Carolina Supreme Court Justice Robert Orr has explained:

Based on my own experiences as a licensed attorney in North Carolina for over 41 years, 18 of which were spent as an elected judge, the absence of primaries will deprive voters of the critical opportunity to more effectively learn about the qualifications of the candidates for those seats. Most importantly in my opinion, the absence of a primary and the potential for a large number of candidates for a judicial office in the general election, significantly undermines the ability of candidates to conduct an effective campaign and to reach voters with relevant information about their qualifications and suitability for office. Finally, having returned to partisan elections for judicial office, the elimination of party primaries deprives the political parties of their fundamental role in selecting a nominee for a particular post. Such circumstances are inconsistent with the fundamental guarantees for democracy as established by our State Constitution.

Declaration of Robert Orr ("Orr Decl.") ¶ 7.

Since 1868, North Carolina has elected the members of its judiciary, sometimes by partisan elections and sometimes by nonpartisan elections, but always with primary elections followed by a general election.[1] Over a period of 48 hours on October 4 and 5,

---

[1] The only exception to this practice has been in temporarily filling late-occurring vacancies in judicial offices.

2017, the General Assembly abandoned history and sound policy and eliminated primaries for all judicial elections, but not for any other elections.

The vehicle for this sudden departure from good policy and our past was a conference committee substitute filed on October 4, 2017 for a bill previously limited to amendments to ballot access laws. N.C. Senate Bill 656, Proposed Conference Committee Substitute, S656-PCCS15254-TC-3 (Oct. 4, 2017). Section 4(a) of this conference committee substitute bill amended the previous bill to eliminate primaries for the election of all members of the judiciary and for the election of district attorneys. Several district attorneys immediately objected to the elimination of primaries for their election, and on October 5, 2017 the conference committee substitute bill was revised to maintain primaries for the election of district attorneys, but not for judges. Declaration of Marcia Morey ("Morey Decl.") ¶ 10. Representative and former Chief District Court Judge Marcia Morey described the rushed addition of Section 4(a) as follows:

> …House rules prohibited any amendments to the Senate committee substitute. To my knowledge, no member of the minority party had prior notice of SB 656 being added to the October 5 calendar, thereby prohibiting discussion or negotiation with members of the majority party.

Morey Decl. ¶ 13. That same day, the revised conference committee substitute bill was passed and sent to the Governor for his approval.

On October 9, 2017, the Governor vetoed this legislation on the grounds that "it abolishes a scheduled election and takes away the right of the people to vote for the judges of their choice." Governor Roy Cooper Veto of N.C. Senate Bill 656, S656-BD-NBC-2169 (Oct. 9, 2017).

The sole reason advanced by Defendants in legislative debates for this assault on democracy and the constitutionally protected role of political parties is legislative convenience. Representative Morey explained:

> The legislative procrastination and resulting chaos on judicial elections is an injustice to the stability and integrity of the judiciary.
>
> SB 656 is an unprecedented law that delays judicial candidate filings from February until June 2018, thereby having a chilling effect on planning purposes for judicial candidates and incumbent judges for the 2018 election.
>
> SB 656 is an unprecedented law that eliminates primaries for all judicial races, thereby denying the electorate their right to learn about candidates and narrow their choices for an intelligent vote in the November election.
>
> The judiciary is a constitutional, independent third branch of government. By legislative procrastination, manipulation and elimination of voters' rights to make reasoned and informed decisions through a historically established election cycle and a primary process, SB 656 destabilizes the judiciary while trampling on voters' rights.

Morey Decl. ¶¶ 17-20.

Further, during debates to override the Governor's veto, Representative David Lewis explained that primaries for judicial elections had been eliminated so that members of the General Assembly "could take our time" in enacting legislation to redraw the boundaries of existing judicial districts. N.C. House of Rep. 2017-2018 Sess., Audio Archives (Oct. 17, 2017) (statement of Rep. Lewis), *available at* https://www.ncleg.net/gascripts/DocumentSites/browseDoc Site.asp?nID=9&sFolderName=\2017-2018%20Session\Audio%20Archives\2017; *see also* Declaration of Caroline Lim ("Lim Decl.") ¶ 5. He also explained that the 2018

judicial elections could be conducted without primaries "like they did in last year's court of appeal race." *Id.*

In response to Rep. Lewis' explanation for eliminating primaries for judges, opponents of Senate Bill 656 reminded Rep. Lewis that members of the appellate courts run statewide, not in districts, and thus that eliminating primaries for appellate judges on the grounds that more time was needed to redraw district and superior court districts was illogical. N.C. House of Rep. 2017-2018 Sess., Audio Archives (Oct. 17, 2017) (statement of Rep. Jackson); *see also* Lim Decl. ¶ 5. Furthermore, in the Court of Appeals election to which Rep. Lewis referred, nineteen (19) candidates' names were on the ballot in November of 2014 to fill a vacancy created by the early retirement of Chief Judge John Martin and the winning candidate received only 23% of the votes cast. Goodwin Decl. ¶ 16; Stephens Decl. ¶ 17; Orr Decl. ¶ 6. Nonetheless, on October 17, 2017, the North Carolina General Assembly eliminated all 2018 judicial primary elections. *See* N.C. Sess. Law 2017-214 ("S.L. 214") § 4(a).

## QUESTION PRESENTED

Should Section 4(a) of S.L. 214 be enjoined, thereby reinstating primary elections for the partisan judicial races in 2018?

## ARGUMENT

Plaintiffs seek an injunction to maintain the status quo until a trial on the merits by prohibiting Defendants from enforcing Section 4(a), thereby restoring primaries for the 2018 judicial elections. The status quo for this purpose is "the last uncontested status

between the parties which preceded the controversy." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). Here, Plaintiffs seek a prohibitory injunction to restore the status quo that has existed in North Carolina since 1868—primary elections for judicial races. This would restore partisan primary elections for justices and judges under N.C. Sess. Law 2016-125 and N.C. Sess. Law 2017-3 in place as of October, 2017. *See* N.C. Sess. Law 2016-125 § 21(a); *see also* N.C. Sess. Law 2017-3 § 5; N.C. Gen. Stat. § 163-106.

To obtain this preliminary injunction under the four-part test established in *Winter v. Natural Res. Def. Council, Inc.*, Plaintiffs must demonstrate to the Court that: (1) they are likely to succeed on the merits; (2) they will suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). To show likely success on the merits, Plaintiffs need not show certainty of success. *Pashby*, 709 F2d at 321.

The role of the district court is to "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). If the showing in one area is particularly strong, an injunction may issue even if the showing in another area is weaker. *Id.* A district court's determination under this test is reviewed for abuse of discretion. *Pashby*, 709 F.3d at 319.

7

In evaluating the need for a preliminary injunction, "district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 726 (4th Cir. 2016), *stay and recall of mandate granted on other grounds*, 136 S. Ct. 2442 (2016).

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A.   Plaintiffs Have a Constitutionally-Protected Interest in Primaries

A political party and its members have constitutionally-protected rights of association under the First and Fourteenth Amendments to the United States Constitution "to band together in promoting among the electorate candidates who espouse their political views." *California Democratic Party v. Jones,* 530 U.S. 567, 574 (2000) (quoted in *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)). "The independent expression of a political party's views is a core First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees." *Colorado Republican Campaign Committee v. Federal Election Comm.*, 518 U.S. 604, 616 (1996) (quoting *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 357 (1971)).

Access to primaries to select their nominee for general elections is the principal means by which political parties express the core constitutional rights afforded political parties and their members. For this reason the Supreme Court has held the First Amendment affords "special protection" to "the process by which a political party 'selects a standard bearer who best represents the party's ideologies and preferences.'"

8

*Jones*, 530 U.S. at 575 (quoting *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 224 (1981)).

Supreme Court cases "vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'selects a standard bearer who best represents the party's ideologies and preferences.'" *Id.* at 575. In a partisan election the primary is "the crucial juncture at which the appeal to common principles [by a political party] may be translated into concerted action, and hence to political power in the community." *Id.* "In no area is the political association's right to exclude more important than in the process of selecting its nominee." *Id.* at 574.

Further, the Supreme Court has recognized the significance of the nomination process, finding that "[t]he ability of the party leadership to endorse a candidate is simply no substitute for the party members' ability to choose their own nominee," and that even when the leadership-endorsed candidate has won, the effect of the endorsement has been negligible. *Id.* at 580-81.

There are two components to the constitutional right at issue here: the right of the members of political parties to identify their preferred candidate through a primary election and the right of the parties to support their nominee in the general election. Both components of Plaintiffs' rights have been extinguished by North Carolina's new law. As Mr. Goodwin has explained,

> Primaries are essential to the accomplishment of the purposes for which the NCDP, and all other political parties, exist. It is the mechanism by which the members of political parties, including the members of the NCDP, select the standard bearers in partisan elections who will best represent their

9

principles and preferences at the general elections. Without primaries, political parties lose the compass they rely on to advance the collective interests and goals of their members. Primary elections give direction to political parties as to the collective will of party members, and determine not only the preferred candidates a party like NCDP has for the general election but also impact the agenda and message of the NCDP heading into the general election. As the United States Supreme Court has observed, the primary is "the critical juncture at which the appeal to common principles may be translated into concerted action and hence to political power in the community." California Democratic Party v Jones, 530 US at 573.

Goodwin Decl. ¶ 10.

**B.     Defendants Cannot Demonstrate Any Legitimate Justification for Burdening Plaintiffs' Constitutional Rights.**

When deciding whether a state election law violates the constitutionally-protected associational rights of a political party, the courts must weigh the "character and magnitude of the burden the State's rule imposes on those rights against the interest the State contends justify that burden, and consider the extent to which the State's concerns make that burden necessary." *Timmons,* 520 U.S. at 358. State laws imposing a "severe burden" on the rights of a political party fail unless the State can prove that its law is narrowly tailored to serve some compelling governmental interest; on the other hand, state laws imposing lesser burdens on the rights of a political party survive if the State can establish that the law is nondiscriminatory and serves "important regulatory interests"

identified by the State.  *Id.; see generally Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008); *Anderson v. Celebrezze,* 460 U.S. 780, 706 (1983).[2]

By any measure the "character and magnitude" of the burden imposed on Plaintiffs in this case by the elimination of primaries for judicial elections is significant. The challenged legislation does not simply delay or modify the primary process; it eliminates it in its entirety.[3]  By eliminating primaries, Defendants also eliminate the Plaintiffs' capacity to perform their core constitutionally-protected duties in more than 150 judicial elections scheduled to be held in 2018.  Whether that significant burden is properly classified as a "severe burden," or some lesser burden, need not be resolved to issue a preliminary injunction here because Defendants cannot establish the law eliminating primaries serves any regulatory interests, much less an important regulatory interest.

The interest states have in regulating elections is in reducing "election- and campaign-related disorder." *Timmons*, 520 U.S. at 358.  The elimination of primaries does not control or limit "election- and campaign-related disorder;" it in fact causes and

---

[2] State laws found invalid include a law prohibiting persons from voting in a primary for a period of 24 months following a change in voter registration*, Kusper v. Pontikes,* 414 U.S. 51 (1973); a law requiring a national party to seat delegates at a national convention contrary to the rules of the national convention, *Democratic Party v. Wisconsin*, 450 U.S. 107 (1981); a law prohibiting independents from voting in a partisan primary, *Tashjian v Republican Party*, 479 U.S. 208 (1986); a law establishing a "blanket primary" in which each voters' ballot list every candidate and allows each voter to choose freely among all candidates, *Jones*, 530 U.S. 567.

[3] Moreover, the elimination of primaries for partisan races is entirely unprecedented in North Carolina, and probably nationally.

promotes "election- and campaign-related disorder." *Id.* at 358. Paradoxically, North Carolina's law eliminating primaries for judicial elections inflicts on Plaintiffs the precise kinds of harm the courts in other cases have found that the states may legitimately guard against.

"There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election," *Anderson,* 460 U.S. at 706. Nevertheless, the elimination of primaries will result in lesser informed and educated voters.[4] "The absence of primaries in 2018 judicial elections will…significantly deprive voters of their best opportunity to learn about the essential qualifications of each candidate." Stephens Decl. ¶ 20. "[T]he absence of a primary and the potential for a large number of candidates for a judicial office in the general election, significantly undermines the ability of candidates to conduct an effective campaign and to reach voters with relevant information about their qualifications and suitability for office.." Orr Decl. ¶ 7. The winning candidates "will not be elected by a well-informed citizenry," and "such a result will undermine democratic principles and greatly weaken the quality and integrity of the judicial branch of government," Stephens Decl. ¶ 21, which is "inconsistent with the fundamental guarantees for democracy as established by our State Constitution." Orr Decl. ¶ 7.

---

[4] Better educated and informed voters is precisely the reason advanced by Defendants to justify their switch from nonpartisan to partisan judicial elections.

Further, Plaintiffs county parties have explained that for down-ballot, local elections, voters generally have much less information about the candidates and that the local parties' ability to better inform the electorate in such races is particularly important. Wake County Democratic Party Chair Rebecca Llewellyn explained:

> Voters typically have much less information about local races—especially local district court and superior court races—because of their lower visibility, the narrower geographical scope of the related elected offices, and the diminished attention paid to them by media.

> Voters will often abstain from voting in local races if they do not feel knowledgeable about them or if they are intimidated by the length of the ballot.

> This confusion will likely depress voting in local races by discouraging voters…

> The harms of eliminating primaries while making elections partisan are suffered most acutely by local political parties such as the WCDP.

Declaration of Rebecca Llewellyn ("Llewellyn Decl.") ¶¶ 17-19, 23.

States also have legitimate regulatory interests in laws designed to avoid overcrowded ballots, to preserve the integrity of the election process and to maintain a stable political system. *Timmons*, 520 U.S. at 364. *See also Eu*, 489 U.S. at 231; *Bullock v Carter* 405 US 134, 145. North Carolina has recent experiences with the cluttered and longer ballots resulting from the elimination of primaries in judicial elections.

> At the 2004 general election eight (8) candidates were on the ballot. There was no clear winner at that election and only 23% of voters supported the candidate ultimately elected to serve on the Supreme Court. At the 2014 general election nineteen (19) candidates were on the ballot. Again, there was no clear winner and only 23% of the voters supported the candidate elected to serve on the Court of Appeals. Neither victor in those two

13

general election contests represented a majority or high plurality of the registered voters casting ballots.

Goodwin Decl. ¶ 16. *See also* Stephens Decl. ¶ 17; Orr Decl. ¶ 6. "Had there been a primary, the winning candidate in the general election would have likely been elected by a majority of the voters." Orr Decl. ¶ 6.

In fact, following the 2014 election, the North Carolina State Board of Elections issued a report addressing voter wait times in the November General Election as a result of the longer ballot. November 2014: State Board of Elections Analysis of Voter Wait Times Report ("State Board Report"); *see also* Declaration of Jesse Presnell ("Presnell Decl.") ¶ 3, Exhibit A. The report of the State Board read, in part:

> For counties utilizing DRE machines as their voting equipment, this meant that the paper rolls in each machine had to be changed more often. This was a product not only of a longer ballot in general, but because of 'spoilage' of ballots resulting from voter confusion in the court of appeals contest referenced above. When voters erroneously marked more than one candidate as their choice, the machine would reject the selection and require that it be recorded again. This consumed far more paper on the machine's rolls than is normal, and each time a machine was taken out of service to change the paper roll, it was one less machine available to voters.

> State Board Report, p. 6.

Presnell Decl. at ¶ 5.

Further, unlike the current statutory scheme, which requires that persons filing as a candidate in party primaries be affiliated with that party for at least 90 days as of the date of filing such notice of candidacy, S.L. 214 does not include any minimum requirement for party affiliation for judicial elections in 2018. *See* N.C. Gen. Stat. § 163-160(b); *see also* S.L. 214 § 4(b). Thus, there is no preventative measure to ensure that judicial

14

candidates who file as Democrats genuinely support Plaintiffs' positions and principles. This likewise offends legitimate regulatory interest identified by the courts. *See Kusper v. Pontikes*, 414 U.S. 51, 59 (1973) (noting interest of states in eliminating the practice whereby voters in sympathy with one party vote in another's party's primary in order to distort the results).

The sole justification identified by Defendants in legislative debates for eliminating primaries in 2018 is in providing more time for legislators to redraw the districts from which candidates for superior and district court seats will run in 2018. Representative Morey explained:

> On Sunday, June 25, 2017, just four days prior to the adjournment of the 2017 legislative "long" session, Representative Justin Burr, sent out a "tweet" stating, "Attached are the maps for the PCS to HB 717 which will be heard tomorrow at 4 pm in Judiciary 1." The maps proposed changes to most of North Carolina's judicial and prosecutorial districts.

> With only one day notice, on June 26, 2017, HB 717 Proposed Committee Substitute titled, "Judicial Redistricting and Investment Act", was heard by the House Judiciary I Committee. After a ninety minute hearing, where members of the public and interest groups were denied access to the cramped hearing room, the bill was voted out of Committee on a 7-5 party line and calendared to be heard by the House the next day.

> On June 27, 2017, the House Bill 717 was, without explanation, withdrawn from the House calendar. It is my opinion and belief that because HB 717 had been "tweeted" out only 72 hours before a vote, that this proposed reconfiguration of statewide judicial and prosecutorial districts had not been properly been explained or vetted to legislators, the legal community or the public.

> The General Assembly completed the 2017 long session on June 30, 2017 and took no further action on HB 717.

On August 30, 2017, the Speaker of the House announced the creation of the House Select Committee on Judicial Redistricting. I was appointed to be a member of the committee, alongside 21 Republican House members and eight Democrats. Three meetings were held in Raleigh; September 12, September 19 and September 27. Every public speaker voiced opposition to the new judicial maps as being too rushed and without thoughtful, deliberative input from the public and legal community. The magnitude of the judicial district changes would result in massive reconfiguration of voting maps and double bunking of incumbent judges, including 43% of African-American judges.

Several District Attorneys opposed changes to prosecutorial maps as proposed in HB 717 and opposed the abolition of primaries for candidates seeking election to the office of District Attorney.

On September 29, 2017, the North Carolina Courts Commission, a non-standing legislative body, established by state law to advise the General Assembly about the administration of justice and evaluate proposed changes to the judiciary, convened and voted 9-5 to recommend that the General Assembly postpone a vote on judicial redistricting until 2018.

On October 5, 2017, the House voted to approve an amended HB 717 that removed prosecutorial district changes but kept massive statewide judicial district changes. A special message was sent to the Senate for consideration of HB 717, as amended.

Also on October 5, 2017, the published House calendar put forth Senate Bill 656 Proposed Conference Committee Substitute, which would change the schedule for statewide judicial races, delaying filing from February 2018 until June 2018 and would eliminate all judicial primaries…

The purpose of Senate Bill 656, which was vetoed by the Governor and overridden by the General Assembly on October 17, 2017, was simply to buy time and "wait and see" if the Senate passes HB 717 in January 2018.

Morey Decl. ¶¶ 5-14 (quotation redacted).

As a matter of law, administrative convenience does not overcome the infringement on Plaintiffs' constitutional rights. *See, e.g.*, *Taylor v. Louisiana*, 419 U.S. 522, 535 (1975) ("administrative convenience" cannot justify a practice that impinges

upon a fundamental right); *Johnson v. Halifax County*, 594 F. Supp. 161, 171 (E.D.N.C. 1984) (finding "administrative and financial burdens on the defendant are not . . . undue in view of the otherwise irreparable harm to be incurred by plaintiffs"). *See also Schneider v. State*, 308 U.S. 147, 161 (1939) ("Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions.").

"Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Kusper*, 414 U.S. at 59 (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)). The challenged legislation is the result of "legislative procrastination" and to trample upon Plaintiffs' constitutional rights merely to provide Defendants more time to redraw judicial districts violates this fundamental principle. Morey Decl. ¶ 17.

## II. PLAINTIFFS WILL SUFFER MULTIPLE FORMS OF IRREPARABLE INJURY IF SECTION 4(A) IS NOT PROMPTLY ENJOINED SO THAT THE 2018 JUDICIAL ELECTIONS MAY BE HELD IN TANDEM WITH OTHER 2018 ELECTIONS.

Failure to enjoin Defendants from eliminating primaries for judicial elections will cause multiple forms of irreparable injury to the Plaintiffs. Initially, it is axiomatic that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013). As demonstrated in Argument I of this Memorandum, Defendants' actions plainly violate Plaintiffs' First and Fourteenth Amendment Rights. It is beyond question that the rights

of the citizens to associate together through political parties for partisan political purposes is among the core values protected by the First and Fourteenth Amendments to the United State Constitution. *Eu*, 489 U.S. at 224.

This irreparable injury to Plaintiffs is compounded in this instance by the damage that will be inflicted on the elections process itself if a preliminary injunction is not issued. Elections have consequences and their results cannot be undone. Denial of "voting and associational rights"—including the ability to "vote for candidates who represent their beliefs"—"cannot be alleviated after the election." *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997); *see Fish v. Kobach*, F.3d , 2016 WL 6093990, at *30 (10th Cir. Oct. 19, 2016) (irreparable harm where "over 18,000 Kansans stood to lose the right to vote in the coming general elections"); *see also Lucas v. Townsend*, 486 U.S. 1301, 1305 (1988) (Kennedy, J., in chambers); *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

Moreover, laws that preclude organizations from fulfilling the purposes for which they exist constitute a form of irreparable injury. *See Action NC v. Strach*, 216 F.3d 597, 642 (M.D.N.C. 2016); *see also Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) ("An organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission."). As NCDP Chairman Goodwin explains, primary elections are essential for the NCDP to carry out its mission of supporting like-minded individuals and

advocating for those shared positions and principles. Goodwin Decl. ¶ 10. "Without primaries, political parties lose the compass they rely on to advance the collective interests and goals of their members." *Id.* The harm to Plaintiffs is heightened for these newly-partisan judicial elections. Requiring candidates to run under partisan labels while simultaneously removing the means by which the party members' select their nominee is irrational and "significantly impairs the structural, recruiting, funding, messaging, and organizing functions" of the NCDP for partisan judicial elections. *Id.* at ¶ 12.

Further, for Plaintiffs county parties, primaries are particularly important for determining the focus of their grassroots efforts and allocation of their generally scarce resources. As Wake County Democratic Chair Rebecca Llewellyn explains, local political parties are responsible for, among other things, "gathering and expending local resources… and cultivating, activating and managing volunteers and other grassroots support." Llewellyn Decl. ¶ 10. Primaries "enable [local] parties focus scarce resources on educating voters about candidates' qualifications and platforms. *Id.* at ¶ 13.

## III. THE BALANCE OF EQUITIES PLAINLY AND DECISIVELY WEIGHS IN FAVOR OF GRANTING PRELIMINARY RELIEF

The balance of hardships here plainly and decisively favors the issuance of an injunction. No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). "Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." *Jones*,

530 U.S. at 574. For all of the reasons described above in Section II and in the Declarations of G. Wayne Goodwin, Donald W. Stephens, Robert F. Orr, Marcia Morey, and Rebecca Llewellyn, Plaintiffs will suffer great and irreparable harm if the 2018 election moves forward without a judicial primary.

In stark contrast, Defendants cannot identify any form of harm, much less irreparable harm that will result if a preliminary injunction is issued. Indeed, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). .

## IV. SIGNIFICANT AND IMPORTANT PUBLIC INTERESTS WILL BE SERVED BY ENJOINING CANCELLATION OF JUDICIAL PRIMARIES

"[U]pholding constitutional rights serves the public interest." *Newsome v. Albermarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). Likewise, "preserving the integrity of the electoral process," and "[sustaining] the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government" are interests of the highest importance. *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 788-89, 98 S. Ct. 1407, 1422 (1978) (internal citations omitted). These interests are furthered by holding primaries for the political parties to determine who will carry their message as their nominee.

By contrast, all of these interests are threatened if judicial primaries are eliminated as retired Judges Orr, Stephens and Morey have explained in their declarations. Without a

primary, it is virtually certain that some judges elected in November will assume their offices without the support a majority of voters. Goodwin Decl. ¶¶ 11, 16-17; Stephens Decl. ¶ 12. In fact, this is what happened in 2004 and 2014, where the prevailing candidates were elected with less than 24% of the vote. Goodwin Decl. ¶ 16; Stephens Decl. ¶ 17; Orr Decl. ¶ 6. It further erodes the representativeness of the judiciary and integrity of the judicial branch when 150 judicial officers will be up for election in 2018.

The risk to the integrity of the judicial process through the placement of persons in judicial office who have earned the votes of only a minority of voters is exacerbated when voters are required to cast their ballots without the benefit of the information obtained in primaries about the ability, integrity and qualifications of candidates for judicial office. *See Dart v. Brown*, 531 F. Supp. 135, 137 (E.D.La. 1982) ("the same state interests in avoiding confusion, deception, and frustration, are served by requiring political parties to attain some significant modicum of support before the party's candidate can be identified as such in elections.") (internal citations omitted), *aff'd*, 717 F.2d 1491.

## V. AVOIDANCE OF IRREPARABLE INJURIES TO THE PLAINTIFFS, PROTECTION OF THE PUBLIC INTEREST, AND PROTECTION OF THE ELECTIONS PROCESS REQUIRES PROMPT ACTION BY THE COURT

The filing period for all 2018 elections, other than judicial elections, begins February 12, 2018 and ends February 28, 2018. N.C. Gen. Stat. § 163-106 (c). The primaries for all 2018 elections, other than judicial elections, will be held on May 8, 2018. The challenged legislation separated the filing period for judicial offices from the

filing period for all other 2018 elections, and delayed the beginning of that filing period until June 18, 2018. S.L. 214 § 4a.

A prompt order from the Court realigning the filing period for 2018 judicial primary elections with the filing for all other 2018 partisan primary elections is necessary in order to prevent the irreparable harm as described in this Memorandum. If a primary election is eliminated or even delayed for judicial elections in 2018, it will have a disastrous effect on the ability of Plaintiffs to identify and support qualified judicial candidates, who may be reluctant to run in such a situation. Candidates must consider several factors when making the decision to run for office, including "work and family obligations…[and] personal goals" and must "gather information about issues of public import, and make various plans and arrangements to run. Candidates must generally do all of this before filing for elective office." Llewellyn Decl. ¶ 21. The confusion that results from the absence of a mechanism to select a party's nominee "interferes with candidates' ability to make confident decisions about whether to run" and "can potentially dissuade qualified candidates from running for office." *Id.* at ¶¶ 22, 27.

Separating the filing period for judicial offices from the filing period for other offices, and delaying it, exacerbates the risk of irreparable harm to the Plaintiffs and the public interest. The likelihood that voters will turnout for a separate primary election for only judicial races is low and a separate judicial primary will likely depress voting in such elections. Additionally, a separate primary election will inevitably lead to increased administrative costs for both state and county election boards, who will have to pay for

22

additional ballots and the operation of polling sites for the separate election, including during another early voting period. A separate primary election will also impact Plaintiffs' abilities to make decisions with respect to the allocation of their resources, which, particularly for local parties, may be scarce. *See id.* at ¶ 13.

Finally, at some point in the elections process, Defendants are likely to assert, as they recently have in other cases, that it is too late in the elections process to hold primaries and conduct general elections in November. A prompt ruling from the Court realigning the filing dates for judicial and other offices for the 2018 elections will avoid the irreparable harms to the Plaintiffs and the harms to the public interest described in this memorandum.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that this Court enter a preliminary injunction against Defendants and order such other and further relief as the Court deems appropriate.

This the 12th day of December, 2017.

WALLACE & NORDAN LLP

By:  /s/ John R. Wallace
     John R. Wallace
     N.C. State Bar No. 7374
     jrwallace@wallacenordan.com
     Dawn E.H. Lee
     N.C. State Bar No. 49258
     dlee@wallacenordan.com
     Post Office Box 12065
     Raleigh, NC  27605
     Telephone: 919-782-9322
     Facsimile:  919-782-8133

     *Counsel for Plaintiffs*

     POYNER SPRUILL LLP

By:  /s/ Edwin M. Speas, Jr.
     Edwin M. Speas, Jr.
     N.C. State Bar No. 4112
     espeas@poynerspruill.com
     Caroline P. Mackie
     N.C. State Bar No. 41512
     cmackie@poynerspruill.com
     P.O. Box 1801 (27602-1801)
     301 Fayetteville St., Suite 1900
     Raleigh, NC  27601
     Telephone: 919-783-6400
     Facsimile:  919-783-1075

     *Counsel for Plaintiff N.C.
     Democratic Party*

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

The undersigned hereby certifies that the foregoing brief, exclusive of the case caption and certificate of service, contains less than six thousand two hundred fifty (6,250) words.

This the 12th day of December, 2017.

POYNER SPRUILL LLP

By:   /s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.
N.C. State Bar No. 4112
espeas@poynerspruill.com
Caroline P. Mackie
N.C. State Bar No. 41512
cmackie@poynerspruill.com
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC  27601
Telephone: 919-783-6400
Facsimile:  919-783-1075

*Counsel for Plaintiff N.C.*
*Democratic Party*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel and parties of record.

I further certify that I have this day served a copy of the foregoing via email and by depositing a copy thereof in an envelope bearing sufficient postage in the United States mail, addressed to the following persons at the following address which is the last address known to me:

Alexander McC. Peters
Chief Deputy Attorney General
Office of the Attorney General
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27601
apeters@ncdoj.gov

Josh Lawson, General Counsel
430 N. Salisbury St., Suite 3128
Raleigh, NC  27603-5918
joshua.lawson@ncsbe.gov

This the 12th day of December, 2017.

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.