IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NORTH CAROLINA DEMOCRATIC PARTY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:17-CV-1113 |
| PHILLIP E. BERGER, et al., | ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

Last fall the North Carolina General Assembly abolished primaries for partisan judicial elections in 2018. No other mechanism was provided to reduce the number of candidates on the general election ballot. Candidates self-designate party affiliation and may change party affiliation as late as the day of filing. This change burdens the associational rights of the plaintiff political parties by impeding their ability to focus support on one candidate and to advance their political and electoral goals in the general election. The defendants have offered a legitimate governmental interest in this change as to elections of superior and district court judges, as the legislature plans to redistrict these seats this year and primaries using current district lines may be unnecessary and will cause confusion if and when the redistricting is complete. The defendants have made no showing of any governmental interest supporting the abolishment of a

mechanism to narrow the field in partisan appellate judicial races, as those judges are elected statewide and are not subject to redistricting.

The plaintiff political parties are not likely to succeed on the merits of their claim that this statute unconstitutionally infringes their First Amendment rights of association to the extent their claim concerns partisan superior and district court judicial races. The plaintiff political parties are likely to succeed on the merits of their claim that this statute infringes their First Amendment rights of association as to partisan appellate judicial races and have otherwise met the requirements for a preliminary injunction. The motion for a preliminary injunction will be granted in part.

## I.   Background and Facts

The North Carolina Constitution requires that the people elect the judges and justices of the district courts, superior courts, and appellate courts. N.C. Const. art. IV, §§ 9, 10, 16. Justices of the supreme court and judges of the court of appeals are elected statewide, N.C. Const. art. IV, § 16, while superior and district court judges are elected within local court districts. N.C. Const. art. IV, §§ 9, 10.

For many years, North Carolina citizens exercised this right through partisan elections with primaries or direct party nomination. *See* Brian P. Troutman, *Party Over? The Politics of North Carolina's "Nonpartisan" Judicial Elections*, 86 N.C. L. Rev. 1762, 1767-68 and n. 28 (2008) (noting that North Carolina has elected judges through partisan elections for more than 100 years).[1] Beginning in 1996 and over the next few

---

[1] The Court omits internal citations, alterations, and quotations throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n. 6 (4th Cir. 2017).

years, the relevant statutes were amended so that all judges were elected in nonpartisan elections and party affiliation was not listed on the ballot. *See generally* Troutman, at 1768-75.[2] These nonpartisan elections included a "top-two" system for primaries, whereby the two candidates with the most votes in the primary advanced to the general election. *See, e.g.,* S.L. 2002-158, § 7.

Until recently, North Carolina law allowed for judicial elections without primaries only when a judicial vacancy at the superior court or appellate court level occurred after the primary but more than 60 days before the general election. N.C. Gen. Stat. § 163-329.[3] In that situation, N.C. Gen. Stat. § 163-329 provided for the judge to be elected during the general election, with the winner determined on a plurality basis pursuant to N.C. Gen. Stat. § 163-292. *Id.* Using this procedure, vacancies on the appellate courts were filled without primaries in 2004 and 2014. Doc. 14-7 at ¶ 16-17. In 2004, eight candidates competed for a single Supreme Court seat. *Id.* at ¶ 17. The winner received only 23 percent of the vote. *Id.* This situation recurred in 2014, when 19 candidates were

---

[2] In 1996, nonpartisan elections were established for superior court judges. *See* S.L. 1996-9, 2d Extra Session, §§ 7, 24 (providing for a nonpartisan primary election method for superior court judges for elections conducted in 1998 and thereafter). Nonpartisan elections for district court judges were established in 2001. S.L. 2001-403, §§ 1, 13 (nonpartisan election of district court judges, effective January 1, 2002). And in 2002, the General Assembly changed the state appellate courts to a nonpartisan method of election, effective for primaries and elections held on or after January 1, 2004. *See* S.L. 2002-158, §§ 7, 16 (providing for the nonpartisan election of appellate judges and justices)

[3] N.C. Gen. Stat. § 163-329 was repealed effective January 1, 2018. *See* S.L. 2017-3, §§ 13, 14 (repealing Article 25 of Subchapter X of Chapter 163 of the General Statutes). Chapter 163 of the General Statutes, as amended, was then re-codified into new Chapter 163A of the General Statutes. S.L. 2017-6, § 3.

on the ballot for a single Court of Appeals seat, and the winning candidate again received

approximately 23 percent of the vote. *Id.*

In 2016 and 2017 the General Assembly made numerous changes to the state

election laws, including enacting laws restoring the partisan method of judicial elections

for the district courts, superior courts, and appellate courts. *See* S.L. 2016-125, §§ 21(a),

21(h) (restoring partisan elections for the court of appeals and the supreme court, and

effective January 1, 2018); S.L. 2017-3, §§ 5, 14 (restoring partisan elections for

superior and district courts, also effective January 1, 2018). Both S.L. 2016-125 and S.L.

2017-3 provided for semi-closed primary elections[4] for major political parties to

determine their nominees. *See* S.L. 2016-125, § 21(a); S.L. 2017-3, § 5; *see also* § 163A-

989). This is consistent with North Carolina's general approach to primary elections for

non-judicial partisan races. *See* N.C. Gen. Stat. § 163A-989 (allowing, but not requiring,

political parties to hold semi-closed primaries). At the same times, the legislature

repealed the provision authorizing elections without primaries when vacancies occur. *See*

S.L. 2016-125, 4th Extra Session, § 21(e) (appellate judges); S.L. 2017-3, § 13 (superior

court judges).

In October 2017, the General Assembly made additional changes to election

procedures, including the provisions related to judicial elections challenged here. *See*

S.B. 656, ratified as S.L. 2017-214. Most of the provisions of S.L. 214 were directed at

---

[4] A semi-closed primary is a primary election that allows unaffiliated voters to participate in
a party's primary, if the party allows. By comparison, in a closed primary, only registered party
members can vote in their own party's primary.

expanding ballot access and were not limited to judicial elections. For example, it reduced the number of signatures required to recognize groups as political parties and for unaffiliated candidates to be listed on the ballot. S.L. 214, §§ 1, 2(a). This law became effective on January 1, 2018. S.L. 214, § 5.

S.L. 214 also made a number of changes specific to judicial elections in 2018. As a result, in 2018 judges will be elected through a process substantially different from both historical practice and from the election process for other, non-judicial partisan races.

First, and specifically at issue in this case, S.L. 214 eliminated party primaries for judicial candidates seeking election to the district courts, superior courts, and the appellate courts for the 2018 elections only. *See* S.L. 214 § 4(a). Primaries were not eliminated for any non-judicial elections, which are scheduled for May 8, 2018. Doc. 14-1 at ¶ 19; Doc. 34 at 3. For judicial races, all candidates will appear only on the general election ballot, *see* S.L. 214, § 4(a), and the candidate who receives the most votes in the general election will win. *See id*. at § 4(k). The elections remain partisan, so that a candidate's party affiliation will be listed on the ballot. The law did not establish any other approved mechanism for a political party's nominee to be listed on the ballot, nor did it establish any other means for reducing the number of candidates who will appear on the general election ballot.

Second, the filing period is different: S.L. 214 establishes a candidacy filing period from June 18 to June 29, 2018, for judicial candidates, S.L. 214, § 4.(a); the candidacy filing period for non-judicial races is from February 12, 2018, to February 28,

2018. *See* N.C. State Bd. of Elections & Ethics Enf't, Candidate Filing Information, *available at* https://www.ncsbe.gov/Elections/Candidate-Filing (last visited on 1/30/2018).

Third, access to the ballot as a candidate is significantly more open for judicial candidates than for other races. Unaffiliated candidates in non-judicial elections must file petitions signed by a certain number of registered voters before they qualify to be placed on the ballot. S.L. 214, § 2(a).[5] But judicial candidates unaffiliated with a party can file without meeting the petition requirement. S.L. 214, § 4(b), (d).[6] As is relevant here, such a judicial candidate need only file a notice of candidacy with the State Board and verify unaffiliated status.[7]

Finally, S.L. 214 permits a judicial candidate to change party affiliation immediately before filing for office. *See* S.L. 214 § 4(b) (containing no minimum requirements for party affiliation for judicial elections in 2018).[8] Thus, for example, a

---

[5] For example, to be placed on the ballot in a non-judicial statewide race, an unaffiliated candidate must file a petition supporting their candidacy that is signed by a number of qualified voters equal to 1.5% of the total number of voters who voted in the most recent general election for Governor. S.L. 214, § 2(a). Additionally, the petition must contain at least 200 signatures from no less than three North Carolina congressional districts. *Id.*

[6] Counsel for the State Board confirmed this at the January 25, 2018, hearing on the motion for preliminary injunction.

[7] There are other requirements, such as paying a filing fee, complying with campaign finance disclosure rules, and, for superior or district court position, residency requirements. *See, e.g.,* S.L. 214, § 4(d), (g), (h); N.C. Gen. Stat § 163A-187; N.C. Gen. Stat. § 163A-1418; *see also* N.C. State Bd. of Elections & Ethics Enf't, Guide for Candidates for Judicial Office in 2018, *available at* https://www.ncsbe.gov/Portals/0/Documents/CandidateGuideJudicialOffice2018.pdf (last visited 1/30/2018).

[8] Counsel for the State Board of Elections confirmed this interpretation of S.L. 214 at the January 25, 2018, hearing on the motion for preliminary injunction. *See also* N.C. State Bd. of

candidate could change from Republican or Unaffiliated to Democrat on the day of filing, and the candidate would then be listed on the ballot as a Democrat. Candidates for other offices must be registered as affiliated with a particular party for at least 90 days before they file to run as a member of that party. N.C. Gen. Stat. § 163A-973.

As a result of these changes, all candidates for judicial office will appear on the general election ballot. For each race, each candidate will be identified by the political party or unaffiliated status, as chosen by the candidate. There is no majority-vote requirement, so if multiple candidates file, it is entirely possible, even likely, that a candidate with only a plurality of votes will win. *See* S.L. 214, § 4(k).

The legislative history indicates and all parties agree that the General Assembly's stated purpose for cancelling primaries for all judicial elections in 2018 was so the legislature would have more time to enact legislation redrawing the boundaries of existing judicial Superior and District court districts. Legislation to redistrict these seats had been introduced in the House during the summer of 2017, Doc. 14-4 ¶ 6, and a committee was appointed to study the matter early in the fall. Doc. 14-4 at ¶ 9. During floor debate on the bill that became S.L. 214, the representative who moved to pass the bill over the governor's veto stated that the reason judicial primaries were abolished was so the legislature could "take our time" in redistricting judicial seats. Doc. 36 at 9 (statement by Representative Lewis); *see also* Doc. 14-4 at ¶ 14; Doc. 36 at 11 (statement

Elections & Ethics Enf't, Guide for Candidates for Judicial Office in 2018, *available at* http://www.ncsbe.gov/Portals/0/Documents/CandidateGuideJudicialOffice2018.pdf (last visited 1/30/2018).

7

by Representative Lewis during floor debate that no districting was contemplated for appellate judicial races); Doc. 34 at 19 (defendants' brief stating that "[n]ew boundaries, if enacted, will not be in place in time for the filing of judicial candidates in February, and it is unlikely that the implementation of any new boundaries will be complete in time for the May primaries").

There will be some 150 judicial races on the ballot in 2018. Doc. 14-7 at ¶ 19. Although the exact breakdown is not in the record, it appears to include at least one Supreme Court race, three Court of Appeals races, more than 30 superior court races, and more than 115 district court races. Doc. 36 at 12 (statement by Representative John during floor debate). The appellate races will appear on the general election ballot statewide, while the superior and district court races will appear on local ballots.

## II.     This Lawsuit

Some two months after the law was enacted, the plaintiffs—the North Carolina Democratic Party and seven county Democratic party organizations— filed this lawsuit against the State of North Carolina; the North Carolina Bipartisan State Board of Elections and Ethics Enforcement; Kim Strach, in her official capacity as the Executive Director of the State Board; Phillip E. Berger, in his official capacity as the President Pro Tempore of the North Carolina Senate; and Timothy K. Moore, in his official capacity as the Speaker of the North Carolina House of Representatives. The plaintiffs contend that the abolishment of a primary for partisan judicial elections infringes upon their fundamental rights of association in violation of the First and Fourteenth Amendments to the United States Constitution. Doc. 2 ¶ 2.

At the same time, the plaintiffs moved for a preliminary injunction. Doc. 14. They ask the Court to enjoin enforcement of Section 4(a) of S.L. 214 and seek an order to restore the status quo for judicial elections before enactment of S.L. 214. Doc. 14 at 2-3. The Court ordered expedited briefing, which has been completed; held a hearing on January 25, 2018; and authorized supplemental briefing that also has been completed.

## III.  Preliminary Issues

The defendants contend that the Court lacks jurisdiction to decide this matter for several reasons. None of these arguments have merit.

First, the defendants contend this case is nonjusticiable. However, it is well established that the federal courts have jurisdiction to hear First Amendment challenges to state election laws. *See, e.g., Eu v. San Francisco Cty. Democratic. Central Comm.*, 489 U.S. 214 (1981) (striking down California law prohibiting governing bodies of political parties from endorsing candidates in party primaries on First Amendment grounds); *Williams v. Rhodes*, 393 U.S. 23, 34 (1968) (striking down Ohio regulations burdening ability of third-party candidates to get on general election ballot on First Amendment grounds).

Second, the defendants contend that the plaintiffs lack standing. However, it is well established that state and local political parties have standing to challenge election laws that they allege infringe on their First Amendment associational rights. *See, e.g., Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) (Washington Republican Party as plaintiff); *Cal. Democratic Party v. Jones*, 530 U.S. 567 (2000) (California Democratic Party, California Republican Party, Libertarian Party of

California, and the Peace and Freedom Party as plaintiffs); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) (New Party as plaintiff); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986) (Republican Party of Connecticut as plaintiff); *Democratic Party of United States v. Wis. ex rel. La Follette*, 450 U.S. 107 (1981) (national and state Democratic Party as defendants); *Eu*, 489 U.S. 214 (local and state committees of the Democratic, Republican, and Libertarian parties as plaintiffs); *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006) (Libertarian Party of Ohio as plaintiff). The record evidence establishes without dispute that the plaintiffs are harmed by the elimination of primaries and the absence of any other mechanism for a party nominee to be identified on the ballot. Doc. 14-1 at ¶ 10, 12; Doc. 14-3 at ¶ 25-28; *see also Wash. State Grange*, 552 U.S. at 452 (noting that the litigants' disagreement was only as to severity of the burden of a law abolishing partisan primaries, not the existence of the burden).

Finally, the defendants assert that the State of the North Carolina and the North Carolina Bipartisan State Board of Elections and Ethics Enforcement are entitled to Eleventh Amendment immunity. Doc. 34 at 11-12. Even if this is so, this does not deprive the Court of jurisdiction over the entire case. The defendants do not contend that the Executive Director of the State Board is not a proper party, nor do they contend that she is immune from suit. Indeed, the Supreme Court has made it clear that prospective injunctive relief against a state officer is not prohibited by the Eleventh Amendment. *Ex Parte Young.* 209 U.S. 123 (1908); *see also Sch. Bd. of Charlottesville, Va. v. Allen*, 240 F.2d 59, 63 (4th Cir. 1956) (noting that state officials "cease to represent the state when

10

[they] attempt to use state power in violation of the Constitution"). Further, the defendants have alleged no facts indicating that the plaintiffs cannot obtain complete relief from the Executive Director of the State Board.

## IV.     The Motion for Preliminary Injunction

Preliminary injunctive relief is an extraordinary remedy involving the exercise of far-reaching powers that courts should use sparingly. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002); *see also Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain a preliminary injunction, a party must show that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm if the injunctive relief is denied, (3) the balance of equities tips in its favor, and (4) injunctive relief would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013).

### A.  Likelihood of success on the merits

"The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas," *Timmons*, 520 U.S. at 357, and to independently express their political views as a party. *Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n,* 518 U.S. 604, 616, (1996). Thus, political parties and their adherents "enjoy a constitutionally protected right of political association." *La Follette*, 450 U.S. at 121. The government, structure, and activities of political parties enjoy constitutional protection, *see Eu*, 489 U.S. at 230 (noting political party's "discretion in how to organize itself, conduct its affairs, and select its leaders"), and the Supreme Court has regularly recognized the interests of

11

political parties in ballot access and other election-related issues.  *See, e.g., Timmons*, 520 U.S. at 363 (identifying burden prohibiting "fusion" designation on ballot as "not trivial").

"It is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons,* 520 U.S. at 358.  "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process."  *Storer v. Brown,* 415 U.S. 724, 730 (1974).  The Constitution grants broad powers to the states to prescribe the time, place, and manner of elections for state offices.  *Tashjian,* 479 U.S at 217.

Thus, not every burden on a political party's preferences constitutes a burden on the right of association, and not every burden on the right of association is unconstitutional.  *See Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983) (noting that no "litmus-paper test" separates acceptable from unacceptable restrictions given that substantial regulation of the electoral process is necessary).  When analyzing whether a state election law impermissibly impinges on associational rights protected by the First Amendment, courts apply the framework developed by the Supreme Court in *Anderson,* 460 U.S. 780, and *Burdick v. Takushi,* 504 U.S. 428 (1992).  *See Marcellus v. Va. State Bd. of Elections*, 849 F.3d 169, 175 (4th Cir. 2017).

As explained in *Anderson*, a court

> must first consider the character and magnitude of the asserted injury to
> the rights protected by the First and Fourteenth Amendments that the
> plaintiff seeks to vindicate.  It then must identify and evaluate the precise

> interests put forward by the State as justifications for the burden imposed
> by its rule.  In passing judgment, the Court must not only determine the
> legitimacy and strength of each of those interests, it also must consider the
> extent to which those interests make it necessary to burden the plaintiff's
> rights.  Only after weighing all these factors is the reviewing court in a
> position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789.  Not all restrictions are subject to strict scrutiny.  *Burdick*, 504 U.S. at 432.  Rather, the "rigorousness" of the inquiry "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights."  *Id.* at 434. Laws imposing "severe" restrictions must be "narrowly drawn to advance a state interest of compelling importance," *id.*, while an election provision that "imposes only 'reasonable, nondiscriminatory restrictions' upon . . . First and Fourteenth Amendment rights" is generally justified by "the State's important regulatory interests." *Id.*; *accord Wash. State Grange*, 552 U.S. at 451–52.

Thus, when applying the *Anderson–Burdick* analysis, courts consider first "the character and magnitude" of the burden that the challenged provision imposes on associational rights.  *Marcellus*, 849 F.3d at 175.  Courts then evaluate that burden in light of the reasons proffered by the state in justification of the burden.  *Wash. State Grange*, 552 U.S. at 451-52.

The plaintiffs contend that § 4(a) of S.L. 214 infringes on their associational rights in a number of different ways, all of which are related to the abolishment of the primary election in what are now partisan races.  They ask the Court to enjoin enforcement of § 4(a), the section of S.L. 214 that abolished primaries for 2018 judicial elections.  The

defendants contend that political parties have no associational right that has been harmed by the abolishment of the primary election.

None of the parties have identified another state that elects officials using only a general election regardless of the number of candidates. Nor has any party identified a state that used such a process in the recent past. No doubt this is because states have decided that limiting the number of candidates on the general election ballot better serves the public good; indeed, the Supreme Court has long recognized that states can undertake reasonable regulations to reduce the number of candidates on the general election ballot in order "to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections." *Bullock v. Carter*, 405 U.S. 134, 145 (1972); *accord Jenness v. Fortson*, 403 U.S. 431, 442 (1971) (holding that "there is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name" of a candidate on the ballot, including interests "in avoiding confusion, deception, and even frustration of the democratic process at the general election."); *Williams*, 393 U.S. at 32 (noting that the state "does have an interest in attempting to see that the election winner be the choice of a majority of its voters.").

Given that it is, at most, highly unusual for a state to decide that it is good practice to have general election ballots with multiple statewide and local races with multiple candidates from each party, it is not surprising that the litigants cannot locate a case discussing whether such a decision violates First Amendment associational rights. *See*

14

Doc. 14-1 at ¶ 15.  As best the Court can tell, the relevant Supreme Court cases discussing relevant associational rights all arise in the context of election systems that involve primaries or other methods restricting access to the general election ballot.  These cases tend to be directed toward the state's interests in regulating elections and not the state's interests in holding a general election without any such restrictions.  And, of course, the fact that a state has a legitimate interest in regulating the numbers of candidates on the ballot does not necessarily mean that the state must so regulate.

While no Supreme Court precedent is controlling, there are several cases providing some guidance.  In *California Democratic Party v. Jones* the Supreme Court emphasized the importance of the primary election in a case challenging a California law prohibiting political parties from excluding non-party members from voting in their primaries.  530 U.S. 567 (2000).  In finding that this statute violated the associational rights of a political party, the Court noted that "[i]n no area is the political association's right to exclude more important than in the process of selecting its nominee" and that the nominating process is "the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." *Id.* at 575.  In *Washington State Grange v. Washington State Republican Party*, the Court upheld a Washington initiative establishing a "top two" primary where candidates were permitted to identify themselves on the ballot by their party preference regardless of whether they were endorsed by or were even members of that party because the statutory system did not require party nomination and there was nothing to indicate the candidates would be designated as the party's nominees.  552 U.S. at 447-59.  The Court further held

that a political party has no First Amendment right to designate its nominee on the general election ballot.  *Wash. State Grange*, 552 U.S. at 453 n. 7.  And in *Timmons v. Twin Cities Area New Party*, where a minor political party challenged a "fusion ban" prohibiting an individual from appearing on the ballot as a candidate of more than one party, the Court recognized that the associational right at issue was "not trivial," but was "unpersuaded" that the party "has a right to use the ballot itself to send a particularized message, to its candidate and to the voters, about the nature of its support for the candidate."  520 U.S. at 363.

Finally, while primaries of one sort or another are the usual means for winnowing down the candidates in modern elections and have historically been the method used in North Carolina, there are other methods.  For example, in *New York State Board of Elections v. Lopez Torres*, the Supreme Court upheld a nominating process for judicial candidates involving party conventions against an individual candidate's challenge.  552 U.S. 196, 202–07 (2008); *see also, e.g.*, *Miller v. Brown*, 503 F.3d 360, 362 (4th Cir. 2007) (explaining other methods of nomination available in Virginia).

It is clear from *Washington State Grange* that the plaintiffs here have no absolute right to use the general election ballot to identify the party's nominee for a judicial office. It is clear from *Lopez Torres* and other cases that a primary election is not the only way a state can constitutionally reduce the number of candidates for the general election and, thus, that political parties cannot demand that states choose the winnowing-down method that the political parties prefer.

On the other hand, all of these cases, particularly *Washington State Grange*, support the view that political parties do have associational rights that are burdened by potentially confusing ballots with multiple candidates claiming to be representatives of the party and by a system, like the one at issue here, that allows candidates to decide what party affiliation will be listed on the ballot. *See Wash. State Grange*, 552 U.S. at 451-52 (noting that the litigants' disagreement was only as to severity of the burden, not the fact of the burden or the existence of the parties' associational rights); *Jones,* 530 U.S. at 574-76 (emphasizing the importance of parties' ability to select their candidate); *Timmons*, 520 U.S. at 363 (identifying ban on "fusion" candidate ballot designation as "not trivial").

With these principles in mind, the Court turns to S.L. 214. Applying the *Anderson-Burdick* test, the Court will weigh the "character and magnitude" of the burden that S.L. 214 imposes on the parties' associational rights against the interests that the State contends justify that burden. The Court will then consider the extent to which the State's concerns make the burden necessary.

It is evident that section 4(a) of S.L. 214 burdens political parties' associational rights. *See Wash. State Grange*, 552 U.S. at 451-52; *see also* Doc. 14-1 at ¶¶ 10, 12-13; Doc. 14-3 at ¶¶ 13, 23. When elections are partisan, political parties have a strong interest in identifying one candidate on the general election ballot who best encompasses the party's views on matters of importance to the courts and who can serve as the party's standard-bearer in the particular race. *See Jones*, 530 U.S. at 575-76; Doc. 14-1 at ¶ 10; Doc. 14-3 at ¶¶ 12-15. When there are multiple candidates claiming a party affiliation and seeking support, the general election ballot can become "a forum for intraparty

17

feuds" rather than a place where "major struggles" are resolved. *Storer,* 415 U.S. at 735; *see* Doc. 14-3 at ¶¶ 15-18, 25-26. In such situations, the party's influence and resources can be diluted. *See Storer*, 415 U.S. at 735*; see also* Doc. 14-1 at ¶ 12; Doc. 14-3 at ¶¶ 10, 12. Even if the party is in unity as to a candidate, the party must overcome the ballot designations of those not chosen by the party but who claim affiliation. *See Jones*, 530 U.S. at 574-75 (pointing out the importance of the ability to exclude those who do not share party goals and beliefs); *see also* Doc. 14-3 at ¶¶ 15-16, 25-26. This costs money and diverts resources from other races. *See* Doc. 14-1 at ¶¶ 7, 12. Further, to the extent that S.L. 214 clutters the ballot and creates voter confusion, this may result in delays at the polls and in decreased voter turnout, particularly in local elections. *See* Doc. 14-3 at ¶¶ 16-19.

Moreover, because S.L. 214 includes no minimum time requirement for party affiliation, in the absence of a primary or other winnowing-down process, the plaintiffs cannot prevent persons who do not actually support its aims from appearing on the general election ballot with the plaintiffs' party designation; by comparison, a primary or another winnowing-down process would allow the party to oppose such judicial candidates who file as Democrats but who do not genuinely support the plaintiffs' positions and principles. *Jones*, 530 U.S. at 574–75 (discussing right to exclude); *La Follette,* 450 U.S. at 122 (same); *Jones*, 530 U.S. at 578–79 (discussing risks from raiding and malicious crossover voting).

Without a primary or some other mechanism to narrow the field of candidates on the general election partisan ballot, the ability of political parties like the plaintiffs to

provide support for their chosen candidate and to leverage that support in other races is restricted and the possibility of confusion and deception arises. *See Bullock,* 405 U.S. at 145 (noting the state's interest in avoiding voter confusion, overcrowded ballots, and protecting the integrity of its political processes from frivolous or fraudulent candidacies); *Jenness*, 403 U.S. at 442 (noting the possibility of confusion and deception when candidates are identified by party but have not shown "a significant modicum of support" from the party before appearing on the ballot). Thus, the Court concludes that the plaintiffs' First Amendment associational rights are burdened by the state's decision to conduct partisan judicial elections in 2018 with no primary or other winnowing process.

Nonetheless, the burden on the parties' interest is not severe. No political party has a right to have its nominee listed as such on the general election ballot, *Wash. State Grange*, 552 U.S. at 453 n. 7, and there are many ways for a political party to spread its message about its chosen candidate and to disavow approval of candidates who claim affiliation but do not share the party's goals. *See Timmons*, 520 U.S. at 361 (noting that the "New Party remains free to endorse whom it likes, to ally itself with others, to nominate candidates for office, and to spread its message to all who will listen"). As currently scheduled, the filing period will close in late June, giving the plaintiffs over four months to choose their candidates and relay their messages about those candidates through interviews, speeches, events, social media, advertisements, and other methods.

Having concluded that the plaintiffs' associational rights are burdened but not severely, the Court considers the reasons proffered by the state in justification of the

burden.  *See Wash. State Grange*, 552 U.S. at 451–52.  Here, the record shows only one

governmental purpose behind abolishing judicial primaries in 2018.  The express and

only purpose of this one-time elimination of judicial primaries was to provide the

legislature with additional time to complete redistricting legislation for the district and

superior courts.  Doc. 36 at 9, 11; Doc. 34 at 19.  The defendants have offered no other

reason for eliminating the primaries for appellate judges.

The Court concludes that the legislature's explanation is both legitimate and

sufficiently weighty to justify the one-time cancellation of the 2018 judicial primaries for

superior and district court judges.  District and superior court judges are elected from

particular districts, and the state could reasonably conclude that it is likely enough to

enact new boundaries for such districts this year that the normal filing period and primary

date are not workable.  The lack of a primary or other winnowing process applies only for

the 2018 election and there is no evidence tending to show that any particular local

general election ballot will be overwhelmed with numerous multi-candidate races.  *See*

*Wash. State Grange*, 552 U.S. at 449–50 (stating that in a facial challenge, courts "must

be careful not to go beyond the statute's facial requirements and speculate about

'hypothetical' or 'imaginary' cases").  There is no evidence that this is likely to cause

voter confusion or other election-day problems at the local level.

By comparison, the General Assembly's articulated reason—gaining more time

for redrawing superior and district court district lines—does not apply at all to appellate

judicial races, as appellate judges are, by constitutional requirement, elected statewide.

N.C. Const. art. IV § 16.  The defendants have offered no explanation for why the

likelihood of new local judicial district lines makes it appropriate to abolish primaries for other judges elected statewide.  *See* Doc. 36 at 11 (statement by Representative Lewis during floor debate that no districting was contemplated for appellate judicial races and offering no explanation in response to questions for why abolishment of primary for appellate races was needed).  Nor have the defendants offered any other justification, in briefs or in evidence, for prohibiting any process to reduce the number of candidates for appellate judgeships who will appear on the general election ballot. [9]

As the Supreme Court instructed in *Timmons*, a court also should examine "the extent to which the State's concerns make the burden necessary."  520 U.S. at 358.  Session Law 214 does not hold up well to this analysis.  Given that appellate judges and justices are not elected from particular districts, the burden that it imposes—cancelling primaries to provide additional time to redraw certain judicial districts—is substantially overbroad in comparison to the law's stated purpose.

Further, the character and magnitude of S.L. 214's burden is more substantial for appellate judges than for local judges.  These judges run statewide, and in 2018 these partisan races will lead the statewide ticket.[10]  The legislature has decided that judicial

---

[9] The situation here is different, for example, from that which arises when there is a late-occurring vacancy, when North Carolina has historically had no-primary general elections.

[10] The Court takes judicial notice that the governor, the lieutenant governor, and the Council of State were elected in 2016 to four year terms.  N.C. State Bd. of Elections & Ethics Enf't, 11/08/2016 Official General Election Results – Statewide, *available at* http://er.ncsbe.gov/?elect ion_dt=11/08/2016&county_id=0&office=COS&contest=0 (last accessed 1/30/2018); *see also* N.C. Const., art. III, §§ 2(1), 7(1), 8.  The Court also takes judicial notice that neither United States Senator is up for reelection in 2018.  N.C. State Bd. of Elections & Ethics Enf't, Online Interactive Election Results, *available at* http://www.ncsbe.gov/Election-Results (election results

races should be partisan, but by giving candidates complete control over party designation, abolishing primaries of any kind, and failing to provide another mechanism for reducing the number of candidates on the general election ballot, the partisan political parties are restricted in their ability to support a particular candidate for these statewide offices and to disassociate at the general election stage from candidates who are not reflective of the parties' goals in judicial elections. *See* Doc. 14-1 at ¶¶ 10-12.

This burden is not hypothetical. In 2014, when a vacancy on the court of appeals was decided without a primary, 19 candidates were on the general election ballot. Doc. 14-1 at ¶ 16. After the 2014 general election, the State Board of Elections issued a report on voter wait times, Doc. 14-6 at ¶ 3, which among other things indicated significant problems with voter confusion in the court of appeals race; in counties with certain kinds of voting machines, this confusion and the long ballots were contributing factors to delays. *Id.* at 8 (noting that the spoilage of ballots resulting from voter confusion over the court of appeals race as contributing to the need to change paper rolls more often, thus removing a voting machine from availability, and, later, noting the long ballot contributed to voter wait times). The winner in that race received only 23% of the vote, just as had happened in 2004 when there were eight candidates for a supreme court seat. Doc. 14-1 at ¶ 16.

This year, the record indicates that at least four statewide judicial races will be on the ballot, giving rise to a high likelihood of several multi-candidate races. Doc. 36 at 12.

---

indicating that Senator Tillis was elected in 2014 and that Senator Burr was reelected in 2016) (last accessed 1/30/2018); *see also* U.S. Const. art 1, § 3.

A cluttered ballot threatens the freedom of political parties to join together to further common beliefs. *See Jones*, 530 U.S. at 574 (noting that representative democracy is "unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views"). The burden and likelihood of harm is not speculative, as the State Board's own report about the 2014 election makes clear.

For these reasons, the statutory provision abolishing primaries for appellate judges and justices while requiring such elections to be partisan, providing no other process to winnow down candidates for the general election ballot, and allowing candidates to self-designate their political party affiliation and to change party affiliation as late as the filing date is likely unconstitutional. Given the over-inclusive nature of S.L. 214, § 4(a) and the General Assembly's lack of any stated interest in cancelling judicial primaries for the appellate courts, the Court concludes that the State's interest is likely not sufficient to justify burdening the plaintiffs' well-established associational rights. As to the appellate court races, the plaintiffs have shown a clear likelihood of success on the merits.

However, as to the district and superior courts, the plaintiffs have not shown a clear likelihood of success on the merits. The burden is lower at the local level and the state has proffered a facially valid legitimate interest in reducing voter confusion in the likely event that the legislature redraws judicial districts for these courts.

## B. Irreparable Harm

A party seeking a preliminary injunction must make a "clear showing of irreparable harm" that is "actual and imminent." *Scotts*, 315 F.3d at 283. The Court has

already summarized many of the burdens imposed by § 4(a) as to appellate races.  *See* discussion *supra*.  Since § 4(a) only applies in 2018, it can hardly be disputed that the plaintiffs would be irreparably harmed if the statute were followed for the 2018 elections and thereafter found to be unconstitutional.  The regularly scheduled filing period is immediately upcoming and the primary is just a few short months away.  The State Board's own report confirms problems with voter confusion and delays on election day when there are multiple candidates for appellate judgeships.

At the hearing on the motion, the Legislative Defendants argued that there is no imminent harm, since a judicial primary could easily be held later in the summer, before the General Election, should the plaintiffs ultimately prevail on the merits.  The State defendants did not disagree.  This is not ideal, since special elections increase costs, as the Legislative Defendants have repeatedly argued in other cases.  *See, e.g.*, Legislative Defendants' Position Statement, Doc. 161 at 10, *Covington v. N.C.* (M.D.N.C. filed July 6, 2017) (No. 15-CV-399).  Special elections have their own set of problems otherwise. *See Covington v. N.C.*, No. 15-CV-399, Memorandum Opinion, Doc. 191, at 2-3, 40-41 (M.D.N.C. Sept. 19, 2017) (noting that special elections may have the effect of confusing voters, raising barriers to participation, and depressing voter turnout); *see also Jackson v. Edgefield Cty., S.C. Sch. Dist.*, 650 F. Supp. 1176, 1190 (D.S.C. 1986) (noting low voter turnout in a special election).  While nothing prevents the legislature from deciding that the benefits of a special primary election outweigh the problems, courts are hesitant to order special elections, especially when the election would need to occur on short notice.

*See generally N.C. v. Covington*, 137 S. Ct. 1624, 1626 (2017) (discussion of the equities involved in ordering special elections in redistricting context).

Taking these factors into account, the Court concludes that the plaintiffs have shown irreparable harm as to the appellate judicial races.

**C. Balancing the equities**

The presumption of constitutionality that attaches to legislative acts "is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of applicants in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984). Nonetheless, as to the appellate judicial races, the Court is satisfied that the balance of the equities tips in favor of the plaintiffs. While the State has a substantial interest in structuring and regulating elections, *e.g.*, *Jones*, 530 U.S. at 572, it has offered <u>no</u> reason for this particular provision as to appellate judges. In the absence of any stated legitimate interest in abolishing primaries for statewide partisan judicial races in which candidates self-affiliate and can change affiliation immediately before filing, and in view of the harm caused by the absence of such a primary, the balance of the equities tips in favor of the plaintiffs. State law already establishes a filing period and a primary is already scheduled, so there are few additional costs of the state to adding several races to the ballot. The plaintiffs seek a return to historical North Carolina practice and to follow the same process for judicial elections as for other partisan elections, which reduces voter confusion.

**D. Public Interest**

The defendants contend that eliminating judicial primaries in 2018 is in the public interest, principally because it is unlikely that judicial redistricting would be complete in time for the May primaries. Doc. 34 at 19. This reason, of course, does not apply to appellate judicial races. The defendants have offered no other public interest in support of the elimination of judicial primaries for appellate judgeships.

The plaintiffs have shown that there is a history in North Carolina of multi-candidate judicial contests when there is no primary. Doc. 14-1 at ¶ 16. They also have shown that in the 2014 general election, 19 candidates ran for a single court of appeals seat, which contributed to longer voter wait times and caused substantial voter confusion. Doc. 14-6 at 7-8. Likewise, they have shown that eliminating primaries for the appellate judicial races would likely lead to no candidate receiving a majority of the vote, Doc. 14-1 at ¶ 16, 17, and cause voter confusion. *See* Doc. 14-6 at 7-8; Doc. 14-3 at ¶¶ 15-16. The Supreme Court has long recognized the public interest in attempting to ensure that elected officials enter office with the support of a majority of voters, *Williams,* 393 U.S. at 32, as well as the public interest in ballots that are not clogged and confusing and that minimize the possibility of candidate deception. *Bullock*, 405 U.S. at 145.

In view of these principles and the litigants' positions, the Court is satisfied that an order enjoining enforcement of § 4(a) as to appellate judges is in the public interest.

**V.    Conclusion**

The plaintiffs have shown a likelihood of success on the merits as to their claim that § 4(a) of S.L. 214 violates their constitutional rights under the First and Fourteenth

Amendments as to appellate judicial races in 2018, but they have not shown a likelihood of success on the merits as to superior and district court races in 2018. As to appellate judicial races, the plaintiffs also have shown irreparable harm, and the balance of the equities and the public interest favors the plaintiffs. Therefore, the motion for preliminary injunction will be granted as to appellate races and denied as to superior and district court races.

It is **ORDERED** that:

1. The plaintiffs' motion for preliminary injunction, Doc. 14, is **GRANTED in part**.

2. The defendant Kim Strach, the Executive Director of the North Carolina Bipartisan State Board of Elections and Ethics Enforcement, is **ENJOINED** from enforcing § 4(a) of Session Law 214 as to appellate judicial races, pending final resolution of this case.

3. The motion is otherwise **DENIED**.

This the 31st day of January, 2018.

_____
UNITED STATES DISTRICT JUDGE