IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA DEMOCRATIC PARTY; et al.,<br>　　　　　　　　　　　　Plaintiffs,<br>　v.<br>PHILLIP E. BERGER, in his official capacity as PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE; et al.,<br>　　　　　　　　　　　　Defendants. | CIVIL ACTION NO. 1:17-cv-1113 |

## PLAINTIFFS' TRIAL BRIEF

This is a challenge to legislation enacted by the North Carolina General Assembly (Section 4 of 2017 S.L. 214) on the grounds that it violates Plaintiffs' First Amendment rights of expression and association.

The principal factual and legal principles relevant to resolving this lawsuit are explored at length in Plaintiffs' Response to Defendants' Motion for Summary Judgment. These principles are highlighted below, though this brief also focuses on why the *Grange* and *Marcellus* decisions are confined to their facts and are not dispositive for this case.

## ARGUMENT

The United States Supreme Court has established the *Anderson-Burdick* sliding scale test for determining whether a state's election regulations improperly curtail the associational rights of individuals or political parties.

> When analyzing whether a state election law impermissibly infringes on association rights protected by the First and Fourteenth Amendments, courts must "weigh the 'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify

that burden, and consider the extent to which the State's concerns make the burden necessary."

*S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752, 756 (4th Cir. 2010) (quoting and citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). This is a fact-dependent inquiry: "We begin from the recognition that '[constitutional] challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test' . . . .'" *Tashjian v. Republican Party*, 479 U.S. 208, 213-14 (1986) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

As the below analysis will show, the burden on Plaintiffs' associational rights greatly outweighs any purported state interest in creating that burden. The challenged legislation does not simply delay or modify the primary process; it eliminates it in its entirety. Thus, the "character and magnitude" of the burden imposed on Plaintiffs by the elimination of primaries for judicial elections is severe.

**I.  Section 4 of 2017 S.L. 214 Imposes Four Distinct Burdens on Plaintiffs**

The cancellation of primary elections for this year's partisan judicial elections imposes substantial and severe burdens on Plaintiffs. For more than a century—and for every other partisan election on the general election ballot this year—the NCDP candidate, chosen by its members rather than the party leadership, was identified as the standard bearer for the NCDP on the ballot. But for the first time ever and only for judicial elections, the General Assembly abandoned history and good policy by eliminating primary elections for judicial elections. This law imposed severe and substantial burdens on Plaintiffs' First Amendment rights:

- First, it deprived the 2,500,000 members of the Democratic Party of the right to vote to identify the Party's standard bearer for the 2018 general elections. *See McCutcheon v. FEC*, 134 S. Ct. 1434, 1462 (2014) (casting a ballot "to support candidates who share their beliefs is a central feature of democracy" protected by the First Amendment.)

- Second, it disrupted the internal operations of the Democratic Party by transferring the power to identify the Party's standard bearer from the members of the Party by their votes to the officers of the Party by their endorsement. *See Tashjian v. Republican Party,* 479 U.S. 208, 224 (1986) (The Constitution protects the right of a political party to formulate "the structure which best allows it to pursue its political goals.").

- Third, it diminished the power of the Party's voice because an endorsement by Party officers is not as effective as nomination by the vote of Party members in winning the general election. *See Cal. Democratic Party v. Jones*, 530 U.S. 567, 580 (2000) ("The ability of the party leadership to endorse a candidate is simply no substitute for the party members' ability to choose their own nominee.").

- Fourth, it diminished the power of the endorsement of Party officers by failing to provide any mechanism on the face of the ballot by which voters at the general election can distinguish an endorsed from an unendorsed candidate. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 461 (2008) ("if the ballot merely lists the candidates' preferred parties next to the candidates' names, or otherwise fails clearly to convey that the parties and the candidates are not necessarily associated, the I-872 system would not survive a First Amendment challenge.") (Roberts, C.J., concurring).

Defendants rely erroneously on *Grange* and *Marcellus v. Virginia State Bd. of Elections*, 849 F.3d 169 (4th Cir. 2017), to counter these burdens. First, *Grange* and *Marcellus* are readily distinguishable as a party nomination process was provided to enable participation by the parties and a winnowing of the candidates. Under S.L. 214, Plaintiffs are not allowed a formal role in the election process; they are foreclosed from advancing their preferred candidates and are denied the benefits of winnowing the number of candidates presented on the ballot.

3

Examining *Grange* more closely, the Supreme Court turned back a facial challenge of a Washington initiative establishing a 'top two' primary in which candidates were permitted to identify themselves on the ballot by their party preference regardless of whether they were endorsed by or were even members of that party. *Grange*, 552 U.S. at 444. In Washington, voters register without party affiliation. Over 90% of those voters vote by mail, a system that enabled the State of Washington to explain and administer this system. In 2004, Washington voters chose to adopt Initiative-872, which provided for a primary election followed by a general election between the "top two" vote-getters. Unlike the State of North Carolina in this case, the record in *Grange* establishes that the State of Washington expected to spend $1,000,000 to explain this balloting system to its voters. The Court concluded that the Washington system was not subject to strict scrutiny because, as noted above, it did not serve to determine the nominees of a party but rather to winnow the number of candidates to a final list of two regardless of their party affiliation. *Grange*, 552 U.S. at 458. The Court did not, however, determine that the Washington system imposed *no* burden on political parties and thus was valid without regard to the justification for the regulation. It instead concluded that Washington's interest "in providing voters with relevant information about the candidates on the ballot" was sufficient to sustain the burden it imposed. *Id.*

Nothing in *Grange* modifies the express holding in *Jones* that regulations infringing on the capacity of a political party "to select its standard bearer" for the general election are severe and can only be justified if narrowly drawn to serve some

4

compelling interest. *Jones*, 530 U.S. at 582. Nonetheless, the present case stands in stark contrast to the electoral scheme under review in *Grange*. Indeed, this Court has appropriately distinguished *Grange* in its February 7, 2018 Order:

> [T]he state system still . . . allowed voters and political parties to work towards narrowing the field for the general election. Thus political parties in Washington had a shot, before the general election, at eliminating candidates bearing their party affiliation but who were not the party's preferred candidate or, more seriously, did not actually share the party's view. That is entirely different from the situation here, where § 4(a) has eliminated the primary—partisan or nonpartisan—entirely. In view of the history of multi-candidate elections under different circumstances, it is highly likely that the plaintiffs at the partisan general election stage will have a ballot affiliation with candidates they have had no opportunity to attempt to defeat.

Feb. 7, 2018 Order, p. 3, n.1, ECF 59 (internal citations omitted). This Court also noted that, in *Grange*, "the litigants' disagreement was only as to severity of the burden of a law abolishing partisan primaries, not the existence of the burden." *Id.* at 2-3; Trial Court's January 31, 2018 order, p. 10. In this case, here "[t]he record evidence establishes without dispute that the plaintiffs are harmed by the elimination of primaries and the absence of any other mechanism for a party nominee to be identified on the ballot." Trial Court's January 31, 2018 order, p. 10, ECF 45 (internal citations omitted).

No state has taken a measure as extreme as the one here, which eliminates primary elections for judges in their entirety for the 2018 elections while maintaining a partisan general election. *See* Jan. 31 Order, p. 14, ECF 45. Thus, "no Supreme Court precedent is controlling." *Id.* at 15. Nonetheless, *Grange* is clearly distinguishable because the statutory scheme there provided a winnowing process, allowed for primaries in which

5

voters could inform themselves about the candidates and what they stand for, and enabled parties to have at least some say in the selection of the general election candidates. *See, e.g.*, *Grange*, 552 U.S. at 453 ("[T]he election regulations specifically provide that the primary 'does not serve to determine the nominees of a political party but serves to winnow the number of candidates to a final list of two for the general election.'"). Also, the court in *Grange* emphasized that voters would not "be confused as to the meaning" of the party labels on the general election ballot because "the voters themselves" enacted the law by referendum. *Id*. at 454-55. This is unlike the present case, where voters have had negligible notice or say in the current scheme.[1] Indeed, the North Carolina system will result in the election, from a potentially long list of candidates, of a candidate who needs only to receive a small percentage of the overall votes. In other words, North Carolina, unlike Washington, has substituted a partisan lottery for an orderly election process. It reduces and dilutes the information available to voters, confuses them, and clutters the ballot to a degree not contemplated in earlier cases.

Lastly, *Grange* is distinct because much of the Court's reasoning was based on case-specific evidentiary and factual grounds. *See, e.g.*, *id.* at 454 ("no basis" for misinterpreting party-preference designation), 455 ("no evidentiary record against which to assess [plaintiffs'] assertions that voters will be confused"), 457 ("In the absence of evidence, we cannot assume that Washington's voters will be misled."). In contrast,

---

[1] There is also a greater likelihood of confusion here because in *Grange*, I-872 applied to every election on the ballot, while, here, the judicial elections will not be distinguishable from other elections on the ballot.

6

Plaintiffs have provided and will provide declarations and trial testimony, exhibits, and other cognizable evidence that substantiate their claims. Defendants have provided little aside from the speculation of counsel. Unlike the facts in *Grange*, the North Carolina general election ballot will display the names and purported party-affiliations of as many candidates as choose to file. The State, unlike the State of Washington, will make its ballots available to voters in one-stop and precinct polling places in their statutorily prescribed format without explanation.[2]

Similarly, the *Marcellus* case is clearly distinguishable as the measure evaluated there was far less extreme than the one *sub judice* in that it considered, (1) in the context of a nonpartisan election, (2) a far less intrusive law that (3) had a far stronger state interest. 849 F.3d 169 (4th Cir. 2017). There, the court declined to strike down a Virginia law that merely removed the use of party labels for local offices. *Id.* at 171-72. However, Virginia continued to permit party nominations. It also sought to minimize partisanship on the ballot, a state interest that is absent here. *Id.* Although the court evaluated the burden-justification balance in favor of the defendants in that case, it acknowledged that the statute may have posed some burden on the plaintiffs' rights. *Id.*

---

[2] A bill was filed on May 22 providing that the following language be printed on the ballot: "No primaries for judicial office were held in 2018. The information listed by each of the following candidates' names indicates only the candidates' party affiliation or unaffiliated status on their voter registration at the time they filed to run for office." SB 456 (available at https://www.ncleg.net/gascripts/BillLookUp/ BillLookUp.pl?Session=2017&BillID=S486) (last visited May 24, 2018). As of the date of the filing of this brief, this bill has been neither debated nor approved.

at 172. The balance in this case simply comes out differently for the reasons expressed herein.

## II. Defendants Cannot Show any Relevant State Interests Sufficiently Weighty to Justify the Burdens on Plaintiffs.

Defendants' Counsel have proposed three justifications for eliminating primaries: (1) a desire to buy time to enact legislation redrawing judicial districts prior to the November 2018 elections; (2) consistency in elections of judges; and (3) a desire to buy time to enact legislation submitting to the voters for their approval a constitutional amendment changing the method of selection of judges prior to the November 2018 elections. Defs' Joint Br. at 20 (ECF 82). Only one of these justifications is found in the legislative record (a desire to buy time to redraw judicial districts)—and evidence of that is even scant. Moreover, that justification has no application to the statewide appellate elections, is a purely administrative justification,[3] and is illogical given that the legislature has been able to continue exploring the redrawing of prosecutorial districts without interfering with district attorneys' elections and could have simply delayed the effective date of any redistricting legislation. The other two justifications have no basis in the record and were never raised until after this Court issued a preliminary injunction

---

[3] As a matter of law, administrative convenience or preference does not overcome an infringement on Plaintiffs' constitutional rights. *See, e.g.*, *Taylor v. Louisiana*, 419 U.S. 522, 535 (1975) ("administrative convenience" cannot justify a practice that impinges upon a fundamental right); *Johnson v. Halifax County*, 594 F. Supp. 161, 171 (E.D.N.C. 1984) (finding "administrative and financial burdens on the defendant are not . . . undue in view of the otherwise irreparable harm to be incurred by plaintiffs"). *See also Schneider v. State*, 308 U.S. 147, 161 (1939) ("Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions.").

8

in January, 2018.[4]  And for the reasons described in Plaintiffs' Summary Judgment Response, even if those justifications are considered, they are not sufficiently weighty to justify the burdens here.

Thus, no matter whether the burdens on Plaintiffs are severe or only substantial, there is no legitimate state interest that can justify the injuries Plaintiffs have and will suffer.

### III. The Appropriate Remedy is a Primary Election for Plaintiffs

The appropriate remedy for the violation of Plaintiffs' rights is a primary election for the North Carolina Democratic Party, at which registered Democrats and unaffiliated voters can cast their votes for Democratic candidates.  The prevailing candidates, and only those candidates, should be listed as Democrats on the general election ballot.  Counsel for Defendants have acknowledged that there is sufficient time to hold a primary.  Jan. 24 Hearing Tr. pp. 75, 89.

### CONCLUSION

For all of these reasons, Plaintiffs respectfully request that the Court find that Section 4 of 2017 S.L. 214 is an unconstitutional infringement of their First Amendment rights.  Plaintiffs further request that the Court grant the relief described in Section III above and such other relief as it deems just and proper.

---

[4] *See generally Barber v. Thomas*, 560 U.S. 474, 486 (2010) (explaining that courts are to lend "little weight to statements, such as those of the individual legislators, made *after* the bill in question has become law."); *Heintz v. Jenkins*, 514 U.S. 291, 298 (1995).

This the 25th day of May, 2018.

**WALLACE & NORDAN LLP**

By: /s/ John R. Wallace
John R. Wallace
N.C. State Bar No. 7374
jrwallace@wallacenordan.com
Matthew M. Calabria
N.C. State Bar No. 39562
mcalabria@wallacenordan.com
Post Office Box 12065
Raleigh, NC 27605
Telephone: 919-782-9322
Facsimile: 919-782-8133

*Counsel for Plaintiffs*

**POYNER SPRUILL LLP**

By: /s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.
N.C. State Bar No. 4112
espeas@poynerspruill.com
Caroline P. Mackie
N.C. State Bar No. 41512
cmackie@poynerspruill.com
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC 27601
Telephone: 919-783-6400
Facsimile: 919-783-1075

*Counsel for Plaintiff N.C. Democratic Party*

## CERTIFICATE OF WORD COUNT

I hereby certify that the foregoing contains fewer than 6,250 words (not including sections excluded by rule), thereby complying with the limitations of Local Civil Rule 7.3(d) (M.D.N.C.).

This the 25th day of May, 2018.

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.

11

Case 1:17-cv-01113-CCE-JEP   Document 90   Filed 05/25/18   Page 11 of 12

## CERTIFICATE OF SERVICE

I hereby certify that I hassve this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel and parties of record.

This the 25th day of May, 2018.

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.

12

Case 1:17-cv-01113-CCE-JEP   Document 90   Filed 05/25/18   Page 12 of 12