IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-CV-1113

| | |
|---|---|
| North Carolina Democratic Party; Cumberland County Democratic Party; Durham County Democratic Party; Forsyth County Democratic Party; Guilford County Democratic Party; Mecklenburg County Democratic Party; Orange County Democratic Party; and Wake County Democratic Party,<br><br>     Plaintiffs,<br><br>  v.<br><br><br>Phillip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate; Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives; the State of North Carolina; the North Carolina Bipartisan State Board of Elections and Ethics Enforcement; and Kimberly Strach, in her official capacity as Executive Director of the North Carolina Bipartisan State Board of Elections and Ethics Enforcement,<br><br>     Defendants. | **DEFENDANTS' TRIAL BRIEF**<br><br>(LR 40.1(c)) |

Pursuant to Local Civil Rule 40.1(c) and the Court's Order of May 18, 2018 (ECF No. 88), Defendants respectfully file this trial brief.[1]

---

[1] Defendants have a pending Motion for Summary Judgment (ECF No. 81) and respectfully submit that this case should be resolved on that motion. Defendants also alternatively stylized their brief in support of summary judgment (ECF No. 82), timely filed on May 11, 2018, as a trial brief.

## INTRODUCTION

Plaintiffs—the North Carolina Democratic Party (the "NCDP") and seven Democratic Party county committees—challenge the constitutionality of Section 4(a) of Session Law 2017-214 (the "Session Law"), alleging that their associational rights protected by the First and Fourteenth Amendments to the Constitution have been violated by the Session Law's cancellation of primaries for all 2018 judicial offices. The Court should deny the declaratory and injunctive relief sought by Plaintiffs because (1) the cancellation of primaries for judicial offices does not burden a political party's associational rights and, (2) even if the Court were to find that the cancellation of primaries burdens Plaintiffs' constitutional rights, the State's interests sufficiently justify the cancellation.

## FACTUAL BACKGROUND

The 2018 judicial elections are the first partisan judicial elections in North Carolina in over a decade. *See* S.L. 2016-125; S.L. 2017-3. On October 17, 2017, the General Assembly enacted Senate Bill 2017-656, which was ratified as North Carolina Session Law 2017-214. 2017 N.C. Sess. Laws 214. The Session Law became effective January 1, 2018, and removed the State-imposed requirement of primaries for candidates seeking election to the district courts, the superior courts, or the appellate courts. S.L. 2017-214 § 4(a) (ECF No. 2-2.). This cancellation of the primaries applies only to the 2018 judicial races. *Id.* § 4(a). Under the Session Law, the judicial candidate for a given office who receives the highest number of votes is elected to that office. S.L. 2017-214 § 4(k). The filing period

for the judicial offices runs from June 18, 2018, to June 29, 2018.  *Id.* § 4(a).  At the time of filing to run for judicial office, the candidate is to indicate on the notice of candidacy the political party with which the candidate is affiliated or any unaffiliated status.  *Id.* § 4(b).  The general ballot will reflect the self-identified party designation or unaffiliated status of all judicial candidates.  *Id.*  The general election is scheduled for November 6, 2018.  *Id.* § 4(a).

## PROCEDURAL BACKGROUND

On December 12, 2017, two months after the Session Law was enacted, Plaintiffs filed their Complaint asserting a facial challenge to the Session Law and alleging that Section 4(a) violates their First and Fourteenth Amendment rights of political association.[2] (ECF No. 2, ¶ 2.)  Plaintiffs also filed a Motion for Preliminary Injunction.  (ECF No. 14.) A hearing was held on January 24, 2018.  On January 31, 2018, the Court entered an order enjoining the Session Law as it applies to appellate judicial races.[3]  (ECF No. 45.) Defendants appealed to the United States Court of Appeals for the Fourth Circuit and sought a stay of the order, which was granted on February 9, 2018.  (*NC. Democratic Party, et al. v. Berger, et al.*, No. 18-1150, ECF No. 32.)  The parties thereafter sought expedited

---

[2] Plaintiffs do not challenge Section 1 (reducing the number of signatures required for political organizations to become recognized political parties), Section 2 (allowing unaffiliated candidates to be listed on the ballot), or Section 3 (defining substantial plurality in primaries) of the Session Law.  *See* S.L. 2017-214 §§ 1, 2, 3 (ECF No. 2-2.).

[3] This Court found that the State's interest as to the local judicial races was sufficiently weighty to justify the burden imposed on Plaintiffs.  (ECF No. 45.)

3

review in the Fourth Circuit, (*id.* ECF No. 29), which was granted on February 16, 2018, (*id.* ECF No. 41–42). On April 2, 2018, this Court denied Defendants' Motion to Dismiss in part, referring to the Order granting a preliminary injunction.[4] (ECF No. 72.) On April 2, 2018, the Fourth Circuit vacated that preliminary injunction, concluding that Plaintiffs had not met their burden for a preliminary injunction "in any respect." (ECF No. 73.)

On May 11, 2018, Defendants filed their Joint Motion for Summary Judgment. (ECF No. 81.)

## ANTICIPATED DEFENSES AND APPLICABLE LAW

Plaintiffs assert a facial challenge to the Session Law, alleging that the cancellation of judicial primaries for 2018 violates their First and Fourteenth Amendment rights. (ECF No. 2, ¶ 2.) Plaintiffs cannot meet their heightened burden on a facial challenge to show that no set of circumstances exists under which the Session Law would be valid. Plaintiffs also cannot establish that the Session Law burdens a constitutional right or, if the Court were to find that there is a burden, that such burden is not justified by legitimate state interests. Therefore, Plaintiffs are not entitled to the relief requested in the Complaint.

**I.     ON THIS FACIAL CHALLENGE, PLAINTIFFS CANNOT ESTABLISH THAT THE SESSION LAW WOULD NOT BE VALID UNDER ANY CIRCUMSTANCES.**

"[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.,* that the law is

_____

[4] Dismissal was granted as to the State of North Carolina and the North Carolina Bipartisan State Board of Elections and Ethics Enforcement due to Eleventh Amendment immunity. (ECF No. 72.)

4

unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739 (1987)); *see also id.* ("a facial challenge must fail where the statute has a plainly legitimate sweep.") (citations and quotations omitted).  Moreover, "[i]n determining whether a law is facially invalid, [courts] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* at 449-50 (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)).

Plaintiffs cannot establish (as they must to be successful on a facial challenge) that there is no circumstance under which the Session Law would be valid and instead rely on speculation and conjecture in support of their position.  Plaintiffs have admitted – and will have to admit at trial – that there is no way to predict how many candidates will seek to run for a given judicial office. (*See, e.g.,* ECF No. 81-2, Llewellyn Deposition at 23:20 ("We're absolutely speculating [about how many people might or might not run].)"); ECF No. 81-1, Goodwin Deposition at 31:19-23.)  If only one candidate who has self-identified as affiliated with the Democratic Party files to run for a judicial office in 2018, the situation is for all intents and purposes identical to a race slated to have a primary but for which only one candidate who has self-identified as affiliated with the Democratic Party files to run. Plaintiffs admit that, under the second scenario, there would be no primary, the candidate would go straight to the general election ballot with a self-identified party label, and the party would have no say in that process. (*See* ECF No. 81-1, Deposition of G. Wayne Goodwin ("Goodwin Deposition"), at 44:7-11); (ECF No. 81-2, Deposition of Rebecca

5

Llewellyn ("Llewellyn Deposition"), at 17:13-14.) In that situation, "that person would be the nominee of the political party for that office in the general election. And [the NCDP] would equate the nominee with the standard-bearer." (*See also* Llewellyn Deposition at 17:10-12.) While the NCDP may try to distinguish the two scenarios, (*see* Goodwin Deposition at 44:19-21), it can only do so by speculating, (*id.* at 44:24-25; 45:1) ("the person could have filed at the last, could have filed and switched parties at the last minute.").[5] Moreover, if only one candidate who has self-identified as a Democrat files for a judicial office, Plaintiffs' concerns regarding ballot clutter, voter confusion, and election of a candidate supported by fewer than a majority of voters (*see* ECF No. 2 at ¶ 42; ECF No. 81-3 at p. 7) will not be realized.

It is anticipated that Plaintiffs will point to judicial races in 2004, in which there were eight candidates on the ballot for a seat on the Supreme Court, and 2014, in which there were 19 candidates on the ballot for a seat on the Court of Appeals, that were conducted without primaries and in which the winners received less than a majority of the

---

[5] Under N.C. Gen. Stat. 163A-973, "No person shall be permitted to file as a candidate in a party primary unless that person has been affiliated with that party for at least 90 days as of the date of that person filing such notice of candidacy." The Session Law sets no explicit length of party affiliation, and Plaintiffs claim that the Session Law facilitates "false registration of Republicans as Democrats." (ECF No. 81-3, Response to Int. No. 2.) However, the possibility of false registration is purely speculative. Plaintiffs can cite no instance where that type of false registration has occurred, much less that a requirement that party affiliation be set 90 days prior to filing to run for office would have allowed the parties to discover a false registration prior to the person filing as a candidate. Moreover, Plaintiffs acknowledge that they do not exclude people from becoming members of the Democratic Party. (*See* Llewellyn Deposition at 32:9-11); (Goodwin Deposition at 6:21-24.)

votes cast. (*See, e.g.*, Declaration of Robert F. Orr, ECF No. 14-5 at ¶ 6, Declaration of Donald W. Stephens, ECF No. 14-7 at ¶ 17.) Again, it is speculative to assume that the 2018 races will mirror those elections. This year's races could just as easily mirror the 2016 race to fill Judge Geer's seat on the Court of Appeals. Like Justice Orr in 2004, Judge Geer stepped down in 2016 too late in the year for a primary to be held, yet only one Democrat, one Republican, and one unaffiliated candidate competed for the office. https://er.ncsbe.gov/?election_dt=11/08/2016&county_id=0&office=JUD&contest=0; *see also* https://www.salisburypost.com/2016/10/11/five-seats-up-for-election-on-nc-court-of-appeals/. Given that there were three candidates running for the office, the winner, Hunter Murphy, won with less than a majority of votes cast. https://er.ncsbe.gov/?election_dt=11/08/2016&county_id=0&office=JUD&contest=0. In fact, given that North Carolina now recognizes not only the Democratic and Republican parties but also the Libertarian and Green parties, *see* https://www.ncsbe.gov/Voters/Registering-to-Vote,[6] and given that unaffiliated candidates may also run for office if certain criteria are satisfied, elections decided by a plurality rather than a majority are to be anticipated regardless. Moreover, Plaintiffs can point to no support for the proposition that there is an associational right prohibiting plurality elections.

---

[6] The Constitution Party may also soon be recognized in North Carolina. https://www.usnews.com/news/best-states/north-carolina/articles/2018-05-15/constitution-party-gets-enough-signatures-to-get-on-ballots.

Judge Stephens is expected to testify that the cancellation of primaries under the Session Law is a threat to the quality of the judiciary and that, without a primary, there is a risk that the best qualified candidates will not be elected. (*See* ECF No. 14-7 at ¶ 21.) However, in the 2004 Supreme Court race cited by Judge Stephens (and heavily referenced by Plaintiffs) in which eight candidates competed in the general election without a primary, the top two vote getters were James A. Wynn, who was, at the time, serving on the North Carolina Court of Appeals and has since been appointed to the Fourth Circuit Court of Appeals, and Paul Newby, who was, at the time, a long-serving Assistant United States Attorney for the Eastern District of North Carolina, and who received the endorsement of the Republican party in that race. https://er.ncsbe.gov/?election_dt=11/02/2004&county_id=0&office=JUD&contest=335; https://www.robesonian.com/archive/38490/view-full_story-1638320-article-candidate_for_high_court_rejects_judicial_activism. Similarly, in the 2014 Court of Appeals race, out of the 19 candidates, the top two vote getters were the candidates endorsed by the Democratic Party, John Arrowood, and the Republican Party, John Tyson, both of whom had previously served on the Court of Appeals. https://er.ncsbe.gov/?election_dt=11/04/2014&county_id=0&office=JUD&contest=1376; https://appellate.nccourts.org/Bios/index.php?c=2&Name=Arrowood; https://appellate.nccourts.org/Bios/index.php?c=2&Name=Tyson; ECF No. 81-3, Plaintiffs' Objections and Responses to Defendants' First Set of Written Discovery, RFA Nos. 2-3.

Without relying on speculation and hypotheticals, Plaintiffs cannot meet their burden to show that the challenged Session Law is invalid in all plausible applications.

## II. PLAINTIFFS' CHALLENGE TO THE SESSION LAW FAILS UNDER THE *ANDERSON-BURDICK* FRAMEWORK.

The Constitution leaves to the states how to regulate their elections in accordance with federal laws, including the Constitution. *See Tashjian v. Republican Party*, 479 U.S. 208, 217 (1986). So long as those regulations do not directly burden a political party's associational rights, courts generally uphold "reasonable, politically neutral" regulations. *Washington State Grange*, 552 U.S. at 452 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).

Under the applicable framework established by the Supreme Court in *Anderson* and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), a court must first determine whether the challenged legislation burdens "rights protected by the First and Fourteenth Amendments . . . ." *Burdick*, 504 U.S. at 432–34; *see also McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995). Only if a law infringes on a protected right must the court analyze the governmental interest offered in support of the challenged legislation. *See Burdick*, 504 U.S. at 432–34.

Plaintiffs cannot establish that a constitutional right to associate has been burdened. However, if this Court were to find that the Session Law does indeed burden a constitutional right, any burden on Plaintiffs would be minimal and would be justified by legitimate state interests. Therefore, Plaintiffs are not entitled to the relief sought.

**A.  Plaintiffs cannot establish that their associational rights are burdened by the Session Law.**

In the Complaint, Plaintiffs alleged that they have a "constitutional right to select their judicial nominees in partisan elections," (ECF No. 2, ¶ 14), and that the Session Law "eliminates the fundamental right of Plaintiffs to choose their judicial nominees in a partisan primary," (ECF No. 2, ¶ 28).  However, as recognized by this Court, (*see* ECF No. 45 at 16), and acknowledged by the Plaintiffs themselves, (*see* ECF No. 68 at 6) ("Plaintiffs do not assert a universal right to a primary"), there is no fundamental right to a primary.

At the preliminary injunction hearing before this Court, Plaintiffs argued that the right at issue is the right to select the party's standard bearer, who they contend is the nominee of the party for the general election.  (*See also* Goodwin Deposition at 44:17-18) ("I would equate the nominee with the standard-bearer.")  But the Session Law does not impinge on the Plaintiffs' right to select a standard bearer; as was the case in *Washington State Grange*, "[t]he essence of nomination—the choice of a party representative—does not occur under [the challenged law]."  552 U.S. at 453.  The Supreme Court made this statement as it distinguished the facts in *Washington State Grange* from *California Democratic Party v. Jones*, 530 U.S. 567 (2000), the case most heavily relied on by Plaintiffs in support of their position.  According to the Court, the Respondents in *Washington State Grange*, like Plaintiffs herein,

> claim that candidates who progress to the general election under I–872 will become the de facto nominees of the parties they prefer, thereby violating the parties' right to choose their own standard bearers . . . and altering their messages. They rely on our statement in *Jones* reaffirming "the special place the First Amendment reserves for, and the special protection it accords, the

10

> process by which a political party 'select[s] a standard bearer who best represents the party's ideologies and preferences.'"
>
> The flaw in this argument is that, unlike the California primary, the I–872 primary does not, by its terms, choose parties' nominees.

*Washington State Grange*, 552 U.S. at 452-53.  The same is true under the Session Law.

At trial, it is anticipated that Plaintiffs will also argue (1) that "*If* the ballot says a party is affiliated with a candidate, such as on the general election ballot, *then* the party must have a say in who that is, such as by a primary," (*see* ECF No. 68 at 6), and (2) that the Session Law "silenced the collective voice" of the members of the Democratic Party and "transferred the power to select the standard bearer of the Democratic Party from the members of the Party through their votes at primaries to the officers of the Party through their endorsements," (*see* ECF No. 84-1 at ¶¶ 28-29).

As an initial matter, the general election ballot does not say that a party is affiliated with a candidate or has otherwise endorsed or approved of a candidate.  Rather, the information on the ballot communicates only that the candidate identifies with the party. Under current State law separate and apart from the Session Law, all candidates running in primary elections file a notice of candidacy that includes their self-identified party affiliation. N.C. Gen. Stat. § 163A-972(a) ("I affiliate with the _____ party, (and I certify that I am now registered on the registration records of the precinct in which I reside as an affiliate of the ____ party.)").  All candidates' party affiliations on the ballot are based on the party affiliation they choose on their voter registration forms.  Candidates (like all voters) simply state a preference to be affiliated with a political party or to be unaffiliated

11

on their voter registration application forms when registering to vote with the applicable county board of elections. *Id*. § 163A-863. Importantly, a candidate does not seek, or need, the party's permission to be affiliated when registering to vote or when filing to run for office. Thus, under North Carolina law, a party identifier on a ballot does not signal a party's endorsement of a candidate. As recognized by the Supreme Court, "There is simply no basis to presume that a well-informed electorate will interpret a candidate's party-preference designation to mean that the candidate is the party's chosen nominee or representative or that the party associates with or approves of the candidate." *Washington State Grange*, 552 U.S. at 454.

In *Washington State Grange*, the Supreme Court analyzed the plaintiffs' arguments that, under the Washington system, voters would at "least assume that the parties associate with, and approve of, them. This, they say, compels them to associate with candidates they do not endorse, alters the messages they wish to convey, and forces them to engage in counter-speech to disassociate themselves from the candidates and their positions on the issues." *Id*. The Supreme Court rejected "each of these contentions for the same reason: They all depend, not on any facial requirement of [the challenged law], but on the possibility that voters will be confused as to the meaning of the party-preference designation." *Id*. According to the Supreme Court, "it is *possible* that voters will misinterpret the candidates' party-preference designations as reflecting endorsement by the parties," but it is equally possible that a well-informed electorate will understand that the party designation is only a preference of the candidate and not an endorsement. *Washington*

*State Grange*, 552 U.S. at 455. As in *Washington State Grange*, Plaintiffs here can present no facts to show that North Carolina voters will be confused by the general election ballot. To the contrary, Plaintiffs have acknowledged that voters are indeed astute. (*See* Llewellyn Deposition at 47:10-11.)

Furthermore, where only one candidate asserting affiliation with a political party files for a given office, the candidate is not included on the primary-election ballot; instead, the candidate's name is printed on the general-election ballot with no vetting by the political party. *Id*. § 163A-983. Plaintiffs consider such unopposed candidates to be the party's nominees and the party's standard bearers without the necessity of a primary election. (*See* Goodwin Deposition at 44:15-17.) This position undermines Plaintiffs' argument that the Session Law's cancellation of a primary harms their right to select their standard bearers.

Additionally, as to any argument that the collective voice of the members of the Democratic Party has been silenced by the cancellation of the primary (*see* ECF No. 89 at Finding of Fact ¶ 28), as addressed above and as acknowledged by Plaintiffs, there is no right to a primary. While Plaintiffs might prefer a primary over other methods of selection, the Session Law does not bar Plaintiffs (or any political party) from selecting their 2018 judicial nominees through some means other than a government-run primary. Rather, as acknowledged by Plaintiffs, some other method of selection—like a convention or caucus—is possible. (*See, e.g.,* Goodwin Deposition at 22:18-25, 60:1-4.) While endorsement by party officials may be the selection method chosen by Plaintiffs (and the

Republican party, *see* ECF No. 81-4), the Session Law does not limit Plaintiffs to that choice.

Moreover, while Plaintiffs take the position that "[t]he voice expressed at primaries is the collective voice of all members of the Democratic Party," (see ECF No. 89 at Finding of Fact ¶ 30), in reality, only a small percentage of North Carolina voters vote in primaries. For example, in the May 2018 primary, only 14.35% of voters cast votes in the primary. https://er.ncsbe.gov/?election_dt=05/08/2018&county_id=0&office=FED&contest=0. And, in the June 2016 specially set primary, only 7.73% of voters cast ballots. http://www.newsobserver.com/news/politics-government/state-politics/article80360517.html; https://er.ncsbe.gov/?election_dt=06/07/2016&county_id=0&office=FED&contest=0. And, of course, it is not only individuals who have self-identified as Democrats who vote in the Democratic Party primary; unaffiliated voters may also vote in the Democratic and Republican primaries. (*See* Llewellyn Deposition at 50:2-11; Goodwin Deposition at 62:21-23; https://www.ncsbe.gov/Voter-Information/VR-FAQ.) Thus, it is inaccurate to argue that the collective voice of "all members of the Democratic Party" is silenced due to the cancellation of the primary.

If Plaintiffs were, in fact, to select their nominees at a convention or otherwise, the nominee could appear on the general election ballot—but without any indicator of the nomination. While Plaintiffs would prefer for the ballot to indicate their nominees, they have no constitutional right to convey such information on the ballot. In *Washington State*

*Grange*, the Supreme Court explained that political parties have no "right to have their nominees designated as such on the ballot. Parties do not gain such a right simply because the State affords candidates the opportunity to indicate their party preference on the ballot." *Id.* at 453 n.7. The same rationale applies here; Plaintiffs have no constitutional right to have their nominees designated as such on the ballot, despite their arguments to the contrary. (*See* Goodwin Deposition at 76:8-77:2.) Plaintiffs do not gain such a right simply because North Carolina allows all candidates to show their party preference on the ballot.

In *Marcellus v. Virginia State Bd. of Elections*, 849 F.3d 169, 172–73 (4th Cir. 2017), the Fourth Circuit rejected a local political party's First Amendment challenge alleging that Virginia's system of identifying the nominating political party of candidates for federal, statewide, and General Assembly offices on the ballot (with labels such as "D" for Democratic party nominee), but restricting the use of any party labels for any local offices, was unconstitutional.[7] The Court held that the law was constitutional because

---

[7] The Fourth Circuit recognized that "[t]he plaintiffs might argue . . . that the presence of party identifiers next to the names of candidates for the Senate and the absence of such identifiers next to the names of candidates for county sheriff might be misleading as voters might incorrectly infer that none of the candidates for sheriff were nominated by a political party." *Marcellus*, 849 F.3d 169, 177 (4th Cir. 2017). However, the court found the decision in *Washington State Grange* controlling: "as the district court noted, the Supreme Court found exactly this type of assumption regarding voter confusion insufficient to support a facial challenge to the election law at issue in *Washington State Grange*." *Id.* Any similar argument regarding voter confusion asserted by Plaintiffs at trial, (*see, e.g.,* ECF No. 89 at Finding of Fact ¶ 24), likewise fails. Moreover, Plaintiffs have acknowledged that voters are indeed astute. (*See* Llewellyn Deposition at 47:10-11.) "[I]t is *possible* that voters will misinterpret the candidates' party-preference designations as reflecting endorsement by the parties," but it is equally possible that a well-informed electorate will understand that the party designation is only a preference of the candidate and not an endorsement. *Washington State Grange*, 552 U.S. at 455.

15

"[t]here [was] no restriction on any candidate's advertising his or her party nomination, association, or endorsement. Moreover, voters [could] learn which candidates were nominated by political parties on the 'What is on my Ballot?' section of the Virginia Department of Elections' website." *Id.* at 173. Here, endorsements are permitted on candidates' advertising, (Goodwin Deposition 89:2-5), and the parties routinely produce for voters their slate of nominees and endorsements, (*id.* at 67:22-25 and Exhibit 13); (Llewellyn Deposition at 39:21-40:25 and Exhibits 9, 10). The *Marcellus* court, relying on *Washington State Grange*, explained that "even though a statute . . . may prevent political parties from indicating on the ballot which local candidates are their nominees, it does not impose a constitutionally cognizable burden on those parties' associational rights." *Marcellus*, 849 F.3d at 176.

For the reasons set forth in *Washington State Grange* and *Marcellus*, Plaintiffs have no right to designate their nominee as such on the ballot or to determine which candidates may use the label "Democrat" on the general election ballot because of the partisan nature of the election.

**B.    Any burden on Plaintiffs' associational rights is minimal and justified.**

To the extent that this Court determines there is a sufficiently identified First Amendment associational right allegedly implicated by the Session Law, Plaintiffs cannot establish anything other than a slight burden, which is justified by the State's legitimate interests.

16

When an election regulation "imposes *no* burdens, it would not fail the balancing test even though it also served no discernible state interest." *McLaughlin*, 65 F.3d at 1221 n.6. If a statute imposes only modest burdens on protected First Amendment rights, then "'the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions' on election procedures." *Washington State Grange*, 552 U.S. at 452 (quoting *Anderson*, 460 U.S. at 788). The focus in cases of a minimally burdensome regulation is on its reasonableness, at least where the regulation is "politically neutral." *Id.* (quoting *Burdick*, 504 U.S. at 438). As made clear in *Burdick*, when rights are subjected to severe restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance," but when a state election law provision imposes only "reasonable, nondiscriminatory restrictions," "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Burdick*, 504 U.S. at 434. (internal quotations and citations omitted).

Here, there are no severe restrictions or burdens. First, the Session Law is politically neutral; it applies equally to all recognized political parties. (*See, e.g.,* Goodwin Deposition at 12:22-25, 13:1-2, 19:2-3, 26:17-18) (discussing alleged impact of Session Law on both Democratic Party *and* Republican Party)). Just as Plaintiffs have contemplated the possibility of a candidate changing party affiliation on the eve of filing or the possibility of multiple candidates affiliated with the same party appearing on the ballot, (*see id.* at 16:22-24, 17:17-20), so, too, has the Republican Party, (*see* ECF No. 81-4, Letter from North Carolina Republican Chair Robin Hayes ("Hayes Letter") ("multiple Republicans and

Democrats are likely to be on the ballot for the same race," and there is "no prohibition on people changing their registration to run").

Second, the law does not prohibit endorsements, speech or communication, *see Eu*, 489 U.S. at 224 (severe infringement where political parties barred from endorsing and opposing candidates); it does not compel the party to associate with voters it does not want to, *see Jones*, 530 U.S. at 577 (2000) (party forced to associate with rival party members for the nomination of its candidates); and it does not regulate the party's internal decision-making, *Timmons*, 520 U.S. at 360 ("*Tashjian* and *Eu* involved regulation of political parties' internal affairs and core associational activities"). The Session Law, therefore, cannot be characterized as imposing a severe burden on Plaintiffs under the Supreme Court precedent.

Non-severe burdens are those that "do not restrict the ability of [a party] and its members to endorse, support, or vote for anyone they like"; "do not directly limit the party's access to the ballot"; and "are silent on parties' internal structure, governance, and policymaking." *See Timmons*, 520 U.S. at 363; *Clingman v. Beaver*, 544 U.S. 581, 589 (2005) ("burdens were not severe because the [party] and its members remained free to govern themselves internally and to communicate with the public as they wished").

It is undisputed that the Session Law does not limit access to the ballot. The Session Law also does not prohibit:

- Advising and training candidates, (Llewellyn Deposition at 13:22-25);

- Communication regarding party affairs, (*id.* 14:1-3);

18

- Managing volunteers or grass-roots support for candidates, (*id.* 14:17-21);

- Communicating with registered democrats, (*id.* 29:13-16); or

- Supporting candidates by giving time, thoughts, money, (*id.* 33:3-15).

Similarly, nothing in the law interferes with or even touches upon the internal governance of the parties. (*Id.* 29:21-25.) Plaintiffs (and all other parties) are "free to canvass the electorate, enroll or exclude potential members, nominate the candidate[s] of [their] choice, and engage in the same electoral activities as every other political party in [North Carolina]." *Clingman*, 544 U.S. at 587. Whether or not a party chooses to engage in that conduct on its own is exclusively up to the party.

The cancellation of the primaries for 2018 judicial races has little to no impact on Plaintiffs due to their admitted limited involvement in primaries. Plaintiffs do not "intervene" in primaries. (*See* Goodwin Deposition at 55:4-8); (*see also* Llewellyn Deposition at 47:20-21.) Individuals self-identify as potential candidates for office; Plaintiffs do not conduct any recruitment unless it is known that no candidate has planned to file for a given office. (Goodwin Deposition at 52:13-18.) Plaintiffs do not spend money on primaries to support any candidates. (*Id.* at 34:7); (Llewellyn Deposition at 14:12-16.)[8] Plaintiffs do not endorse candidates in or during primaries. (ECF No. 81-3, Response to

---

[8] Representative Marcia Morey is expected to testify that the Session Law "deprives the electorate of their best chances to learn about judicial candidates." (ECF No. 89 at Finding of Fact ¶ 43; *see also* ECF No. 14-4 at ¶ 19.) However, Plaintiffs admit that the Democratic Party's efforts to educate voters about candidates is reserved for the general election. (*See* Llewellyn Deposition at 18:1-8.)

Int. No. 3; Llewellyn Deposition at 13:3-4.)  While Plaintiffs are now considering an

endorsement process,[9] it is only tradition—not an explicit party policy—that prevents

Plaintiffs from endorsing one Democrat over another.  (Llewellyn Deposition at 43:19-25.)

Plaintiffs can adapt.  (*See, e.g.,* Goodwin Deposition at 61:21-23 ("Our Executive Council

met extremely recently to consider an endorsement process.").)

### C.  Important regulatory interests justify any burden in this case.

"When a state electoral provision places no heavy burden on associational rights, 'a

State's important regulatory interests will usually be enough to justify reasonable,

nondiscriminatory restrictions.'"  *Clingman*, 544 U.S. at 593 (quoting *Timmons*, 520 U.S.

at 358).  In other words, where there is a slight burden, a relevant and legitimate state

interest need only be "sufficiently weighty to justify the limitation."  *Crawford v. Marion

Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (quotation and citation omitted).  The State's

interests—to mitigate the potential impact of (1) redistricting, (2) moving away from

judicial elections in the State, and (3) the inconsistency that would result from split judicial

elections in 2018—are sufficient to justify the slight burden alleged by Plaintiffs.

The redistricting legislation relevant to the Session Law, House Bill 717, passed the

North Carolina House on the same day the Session Law was enrolled, and, at the time of

the ratification of the Session Law, House Bill 717 was moving forward for consideration

---

[9]  The Republican Party is also contemplating an endorsement process.  (*See* ECF No. 81-4, Hayes Letter) (laying out plan for endorsement of candidates prior to filing).

by the North Carolina Senate. *See* House Bill 2017-717. As of October 2017, when the Session Law was ratified, more time was needed to evaluate redistricting.

In January 2018, following passage of the Session Law, the Senate Select Committee on Judicial Reform and Redistricting noted that it had "met over the past two months to consider the important issues of how North Carolina selects its judges and whether changes are needed to the state's existing judicial districts." (*See* ECF No. 81-5, January 3, 2018, Senate Select Committee on Judicial Reform and Redistricting Letter to President Pro Tempore Berger.) A Joint Select Committee on Judicial Reform and Redistricting further considered redistricting and plans for possible amendments to the Constitution regarding the selection of judges—review that is currently ongoing. (*See* https://www.ncleg.net/gascripts/committees/committees.asp?sAction=ViewCommittee&sActionDetails=Non-Standing_6719 (providing link to materials for April 27, 2018 meeting of Joint Select Committee on Judicial Reform and Redistricting (2017)).

North Carolina has a legitimate interest in accommodating these potential changes to districts and selection of judges and in avoiding the confusion that could occur from dissimilar treatment across all categories of judicial races (*i.e.*, primaries for some but not all). *See, e.g., Marcellus*, 849 F.3d at 177 (finding no burden where all candidates for same office were treated alike). The General Assembly considered, debated, and rejected the policy reasons Plaintiffs now offer for separating the appellate court races. (*See* ECF No. 81-6, Caroline Lim Transcript of October 17, 2017, debate of Senate Bill 656.) The Supreme Court and the Court of Appeals have acknowledged that states have a legitimate

interest in administrative efficiency and stability in the election process. *See Burdick*, 504 U.S. at 438–39; *Rosario v. Rockefeller*, 410 U.S. 752, 760 (1973); *Storer v. Brown*, 415 U.S. 724, 736 (1974); *Wood v. Meadows,* 207 F.3d 708, 715–16 (4th Cir. 2000). Through the Session Law, the State has placed a priority on those interests. Because cancelling a primary election for judicial candidates whose self-identified party affiliation appears on the general election ballot passes constitutional muster, the Court should deny the relief sought by Plaintiffs.

In an effort to discredit the proffered justifications for the Session Law, Plaintiffs are expected to rely heavily on laws and resolutions passed by the General Assembly that are not challenged or otherwise at issue in this action. For example, Plaintiffs will point to session laws pursuant to which redistricting or other election changes (e.g., legislation changing the method of election for judicial offices) were delayed so as to affect "the next election following enactment of the legislation." (ECF No. 89 at Findings of Fact ¶¶ 37-39.) However, in the past, redistricting legislation *has* had an impact on races taking place in the year of passage and implementation. *See, e.g.* Session Law 2004-127, § 2. Moreover, under North Carolina law, "One General Assembly traditionally cannot bind another." *Goldston v. State*, 199 N.C. App. 618, 627, 683 S.E.2d 237, 243 (2009).

Plaintiffs are expected to offer their critiques of House Bill 717 as "evidence" that Defendants' proffered justifications for the Session Law are false. Of course, House Bill 717 is not challenged in this action. Moreover, even if the concerns Plaintiffs highlight about House Bill 717 (e.g., that more incumbent judges registered as Democrats than those

registered as Republicans are "double bunked" under the proposed new boundaries), Plaintiffs acknowledge that "as of this date, three sets of alternative maps for judicial districts have been presented to the Joint Committee." (ECF No. 89 at Finding of Fact ¶¶ 50, 53.) Thus, the justification offered by Defendants—that more time was needed to consider redistricting—is a legitimate state interest for the cancellation of primaries even if Plaintiffs do not like the redistricting plans under consideration.

## PLAINTIFF'S REQUESTED REMEDIES

For the reasons set forth in Defendants' Joint Brief in Support of their Joint Motion for Summary Judgment (ECF No. 82) and as set forth above, Defendants disagree that Plaintiffs are entitled to their proposed remedy (*see* ECF No. 89 at p. 19). However, if the Court were to find in favor of Plaintiffs, Defendants request to be heard on issues regarding the Court's remedy including but not limited to (1) the application of the remedy to all political parties—not just the Democratic party (*see* ECF 89 at p. 19); and (2) the practical impact of holding a special primary for judicial races.

## CONCLUSION

For the foregoing reasons and authorities, Defendants respectfully submit that this Court should deny the relief sought by Plaintiffs.

Respectfully submitted this 25th day of May, 2018.

> NELSON MULLINS RILEY &
> SCARBOROUGH LLP
>
> By: /s/ D. Martin Warf
> Noah H. Huffstetler, III
> N.C. State Bar No. 7170
> D. Martin Warf
> N.C. State Bar No. 32982
> 4140 Parklake Avenue, Suite 200
> Raleigh, NC 27612
> Telephone: (919) 877-3800
> noah.huffstetler@nelsonmullins.com
> martin.warf@nelsonmullins.com
>
> *Attorneys for Philip E. Berger, in his official*
> *capacity as President Pro Tempore of the*
> *North Carolina Senate, and Timothy K.*
> *Moore, in his official capacity as Speaker of*
> *the North Carolina House of*
> *Representatives*

JOSHUA H. STEIN
Attorney General

<u>/s/ James Bernier, Jr.</u>
James Bernier, Jr.
Special Deputy Attorney General
N.C. State Bar No. 45869
Email: jbernier@ncdoj.gov

Olga E. Vysotskaya de Brito
Special Deputy Attorney General
N.C. State Bar No. 31846
Email: ovysotskaya@ncdoj.gov

Amar Majmundar
Senior Deputy Attorney General
N.C. Bar No. 24668
Email: amajmundar@ncdoj.gov

Alexander McC. Peters
Chief Deputy Attorney General
N.C. State Bar No. 13654
Email: apeters@ncdoj.gov

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602-0629
Telephone: (919)716-6900

*Attorneys for Kimberly Strach, in her official capacity as Executive Director of the North Carolina Bipartisan State Board of Elections and Ethics Enforcement*

25

## CERTIFICATE OF WORD COUNT

I certify that the foregoing **Defendants' Trial Brief** contains fewer than 6250 words (exclusive of those sections of the Brief excluded by rule), which complies with the word limitations of Local Civil Rule 7.3(d) (M.D.N.C.).

This the 25th day of May, 2018.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s/ D. Martin Warf
Noah H. Huffstetler, III
N.C. State Bar No. 7170
D. Martin Warf
N.C. State Bar No. 32982
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
Telephone: (919) 877-3800
noah.huffstetler@nelsonmullins.com
martin.warf@nelsonmullins.com

*Attorneys for Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives*

## CERTIFICATE OF SERVICE

I certify that I have this day electronically filed the foregoing **Defendants'**

**Trial Brief** with the Clerk of Court using the CM/ECF system which will send notification

of such filing to all counsel and parties of record.

This the 25th day of May, 2018.

NELSON MULLINS RILEY &
SCARBOROUGH LLP

By: /s/ D. Martin Warf
Noah H. Huffstetler, III
N.C. State Bar No. 7170
D. Martin Warf
N.C. State Bar No. 32982
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
Telephone: (919) 877-3800
noah.huffstetler@nelsonmullins.com
martin.warf@nelsonmullins.com

*Attorneys for Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives*