IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NORTH CAROLINA DEMOCRATIC PARTY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:17-CV-1113 |
| PHILLIP BERGER, et al., | ) ) | |
| Defendants. | ) | |

## TRIAL FINDINGS AND CONCLUSIONS

Catherine C. Eagles, District Judge


### I.   PROCEDURAL HISTORY

1. On December 12, 2017, the plaintiffs filed their complaint, challenging the

   constitutionality of Section 4(a) of S.L. 2017-214, which cancelled primaries for

   judicial elections in 2018 and seeking declaratory and injunctive relief.  Doc. 2.  All

   parties agree that this is a facial challenge to the law.

2. On January 31, 2018, this Court granted the plaintiffs' motion for preliminary

   injunction in part, enjoining enforcement of S.L. 214 as to appellate judicial races

   pending final resolution of the case.  Doc. 45.

3. The defendants appealed to the United States Court of Appeals for the Fourth Circuit,

   which vacated the preliminary injunction.  After stating that a "plaintiff seeking a

   preliminary injunction must establish that he is likely to succeed on the merits, that he

   is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest," the Fourth Circuit concluded without discussion that the plaintiffs "have not met their burden in any respect." *N. C. Democratic Party v. Berger*, 717 F. App'x 304, 306 (4th Cir. 2018).[1]

4. On April 2, 2018, this Court dismissed the State of North Carolina and the Bipartisan State Board of Elections and Ethics Enforcement as parties based on Eleventh Amendment immunity. Doc. 72.

5. The matter came on for trial on June 7, 2018.

## II.    FACTS

The Court has weighed the evidence at trial, the stipulations, and the documentary exhibits. The Court provides citations to some of the evidence that supports its factual findings but has not attempted to cite all supporting evidence. The Court has disregarded evidence of non-material matters. The Court overrules the objections by the defendants to the testimony of Marcia Morey. The Court considered the testimony of Gerry Cohen, which was uncontested as to its accuracy, as a helpful summary of North Carolina legislative actions over the years and takes judicial notice of the relevant session laws mentioned and discussed in his testimony. The Court has found facts as to some events occurring after S.L. 214 was enacted but has given those facts little to no weight, as this lawsuit is a facial challenge to the statute.

---

[1] The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *United States v. Marshall*, 872 F.3d 213, 217 n. 6 (4th Cir. 2017).

The evidence at trial establishes the following facts, which the Court finds by a preponderance of the evidence. *See Raleigh Wake Citizens Ass'n. v. Wake Cty. Bd. of Elections*, 827 F.3d 333, 342 (4th Cir. 2016) (noting preponderance of the evidence standard).

**The parties:**

1.  Plaintiff North Carolina Democratic Party is a political party as defined in N.C. Gen. Stat. § 163A-950 (West, Westlaw through S.L. 2018-2).

2.  Plaintiffs Cumberland County Democratic Party, Durham County Democratic Party, Forsyth County Democratic Party, Guilford County Democratic Party, Mecklenburg County Democratic Party, Orange County Democratic Party, and Wake County Democratic Party are the official political committees for Democrats in their respective counties and are separately and independently registered and reporting political committees.

3.  Defendant Phillip E. Berger is the President Pro Tempore of the North Carolina Senate.

4.  Defendant Timothy K. Moore is the Speaker of the North Carolina House of Representatives.

5.  Defendant Kimberly Strach is the Executive Director of the North Carolina Bipartisan State Board of Elections and Ethics Enforcement.

**Election of judges in North Carolina:**

6.  The North Carolina Constitution requires that the people elect the judges and justices of the district courts, superior courts, and appellate courts. N.C. Const. art. IV, §§

3

9(1) (superior court judges), 10 (district court judges), 16 (supreme court justices and court of appeals judges).

7. Justices of the supreme court and judges of the court of appeals are elected statewide, N.C. Const. art. IV, § 16, while superior and district court judges are elected within local judicial districts.  N.C. Const. art. IV, §§ 9, 10.

8. Historically, North Carolina citizens exercised this right through partisan elections with primaries or direct party nomination, followed by a general election.  *See* Brian P. Troutman, *Party Over? The Politics of North Carolina's "Nonpartisan" Judicial Elections*, 86 N.C. L. Rev. 1762, 1767–68 and n. 28 (2008).  From 1868 to 1915, political parties nominated candidates for judicial offices at their party conventions.  *Id.* at 1767; Doc. 103 at 112.  From 1915 to 2016, candidates for judicial offices were nominated at primaries.  Doc. 103 at 111–12.  These primaries were partisan for most of the 20th century.  *Id*. at 98–99.  Beginning in 1996 and over the next few years, the relevant statutes were amended so that all judges were elected in nonpartisan elections and party affiliation was not listed on the ballot.  *Id.*[2]  These nonpartisan elections included a "top-two" system for primaries, whereby the two candidates with the most votes in the primary advanced to the general election.  *See, e.g.,* S.L. 2002-158, § 7.

---

[2] In 1996, nonpartisan elections were established for superior court judges.  *See* S.L. 1996-9, 2d Extra Session, §§ 7, 24 (providing for a nonpartisan primary election method for superior court judges for elections conducted in 1998 and thereafter).  Nonpartisan elections for district court judges were established in 2001.  S.L. 2001-403, §§ 1, 13 (nonpartisan election of district court judges, effective January 1, 2002).  And in 2002, the General Assembly changed the state appellate courts to a nonpartisan method of election, effective for primaries and elections held on or after January 1, 2004.  *See* S.L. 2002-158, §§ 7, 16 (providing for the nonpartisan election of appellate judges and justices).

9.  Until enactment of the statute at issue, North Carolina law allowed for judicial elections without primaries only when a judicial vacancy at the superior court or appellate court level occurred after the primary but more than 60 days before the general election.  N.C. Gen. Stat. § 163-329.[3]  In that situation, N.C. Gen. Stat. § 163-329 provided for the judge to be elected during the general election, with the winner determined on a plurality basis pursuant to N.C. Gen. Stat. § 163-292.

10.  Using this procedure, vacancies on the appellate courts were filled without primaries in 2004, 2014, and 2016.  Doc. 103 at 33–34; Def. Exh. 19 at 9; Def. Exh. 21.  In 2004, eight candidates competed for a single supreme court seat in a non-partisan election.  Def. Exh. 17 at 6.  The winner received approximately 23 percent of the vote.  *Id.*  This situation recurred in 2014, when 19 candidates were on the ballot for a single court of appeals seat.  Def. Exh. 18 at 16–17.  The winning candidate received approximately 24 percent of the vote.  *Id.*

11.  In 2016 and 2017, the General Assembly enacted laws restoring the partisan method of judicial elections for the district courts, superior courts, and appellate courts.  *See* S.L. 2016-125, §§ 21(a), 21(h) (restoring partisan elections for the court of appeals and the supreme court, effective January 1, 2018);  S.L. 2017-3, §§ 5, 14 (restoring partisan elections for superior and district courts, and effective January 1, 2018).  Both S.L. 2016-125 and S.L. 2017-3 provided for semi-closed primary elections for

---

[3] N.C. Gen. Stat. § 163-329 was repealed effective January 1, 2018.  *See* S.L. 2017-3, §§ 13, 14 (repealing Article 25 of Subchapter X of Chapter 163 of the General Statutes).  Chapter 163 of the General Statutes, as amended, was then re-codified into new Chapter 163A of the General Statutes.  S.L. 2017-6, § 3.

major political parties to determine their nominees. *See* S.L. 2016-125, § 21(a) and S.L. 2017-3, § 5; *see also* N.C. Gen. Stat. § 163A-989). This is consistent with North Carolina's general approach to primary elections for non-judicial partisan races. N.C. Gen. Stat. § 163A-989 (West, Westlaw through S.L. 2018-2) (allowing, but not requiring, political parties to hold semi-closed primaries).

12. In 2016, after a judge on the court of appeals stepped down too late in the year for a primary to be held, Def. Exh. 21, only three candidates competed for the office: one Democrat, one Republican, and one unaffiliated candidate. Def. Exh. 19 at 9. The ballot for this race listed each candidate's party affiliation.[4] *Id.* The winner received less than a majority of the votes cast. *Id.*

13. It is not always necessary to hold primaries for judicial or other races, as there may not be more than one candidate from a particular party in a partisan race or more than two candidates when judicial races were non-partisan. *See, e.g.,* Doc. 103 at 141–42 (Rep. Morey testifying that she had no primary election in May 2018 because she had no Democratic opponent); *see also supra*, ¶ 12 and n. 4; Def. Exh. 19 at 9 (showing that only one self-identified Democrat filed for an open court of appeals seat in 2016).

14. For trial courts, judicial districts are established by statute. N.C. Gen. Stat. § 7A-41 (West, Westlaw through S.L. 2018-2) (superior courts); N.C. Gen. Stat. § 7A-130 (West, Westlaw through S.L. 2018-2) (district courts). District Attorneys are also

---

[4] Confusingly, the 2016 court of appeals race was officially nonpartisan, *see, supra,* ¶ 11, but each candidate's party affiliation was listed on the ballot. *See* Def. Exh. 21; *see also* S.L. 2015-292 (requiring candidates for court of appeals judgeships to list their party affiliation on their notice of candidacy and putting this party affiliation on the ballot, effective September 29, 2015).

6

elected from districts, the lines of which generally line up with judicial districts. *See id.* § 7A-60.

15. The legislature first addressed judicial redistricting in April 2017 when H.B. 717 was introduced. Pl. Exh. 28. Initially, H.B. 717 addressed only superior court districts. Pl. Exh. 29 (H.B. 717 version 1). No action was taken on the bill until June 2017.

16. On June 25, 2017, Representative Burr, one of the bill's sponsors, "tweeted" out maps proposing changes to North Carolina's superior and district court judicial districts and to prosecutorial districts. Doc. 103 at 134; Pl. Exh. 28 at 6/26/2017 (showing the maps for Proposed Committee Substitute 40632-ST-37). These maps affected judicial districts across the state. Doc. 103 at 134. Soon thereafter, the Judiciary I Committee approved the proposed maps. Pl. Exh. 28 at 6/26/2017 (showing that H.B. 717 was voted out of committee with a favorable report). No further action was taken until late August 2017, when the Speaker of the House appointed a select committee on judicial redistricting and referred the bill to that committee. Pl. Exh. 28 at 8/30/2017; *see also* Doc. 103 at 133.

17. An amended version of H.B. 717 passed the House on October 5, 2017. Pl. Exhs. 28 and 30. This version changed superior court judicial divisions, the district configurations of counties for superior courts, superior and district court judicial districts, prosecutorial districts, and the selection method for district and superior court judges in the new districts. Pl. Exh. 30; Doc. 103 at 135–36. According to the General Assembly website, the legislature has since taken additional action on H.B. 717. North Carolina General Assembly, Legislative History Page, H.B. 717, 2017-

7

2018 Sess., https://www2.ncleg.net/BillLookUp/Index/2017/H717/True (last accessed 6/22/2018).

18. Since the enactment of the statute at issue here, the legislature has enacted other legislation that affects the judicial redistricting process. Just days before trial, the legislature ratified S.B. 757, which would make various changes to trial court districts in Mecklenburg, New Hanover, Pender, and Wake counties. North Carolina General Assembly, Legislative History Page, S.B. 757 2017-2018 Sess., https://www2.ncleg.net/BillLookUp/2017/S757 (last accessed 6/22/2018). At trial, the plaintiffs presented evidence of effects flowing from the timing of action on S.B. 757. Doc. 103 at 28–29. According to the legislative website, there have been additional developments since as to S.B. 757. Legislative History Page, S.B. 757.

**S.L. 2017-214**

19. In October 2017, the General Assembly made additional changes to election procedures, including the provisions related to judicial elections challenged here. Pl. Exh. 1 (S.B. 656, 2017-2018 Sess. (N.C. 2017), ratified as S.L. 2017-214).[5] Most of the provisions of S.L. 214 were directed at expanding ballot access and were not limited to judicial elections. *E.g.,* S.L. 214, §§ 1, 2(a). This law became effective January 1, 2018. S.L. 214, § 5.

---

[5] Senate Bill 656 as amended was ratified on October 5, 2017, and sent to Governor Roy Cooper for approval. Pl. Exh. 2. On October 9, 2017, Governor Cooper vetoed the bill on the grounds that it "abolishes a scheduled election and takes away the right of the people to vote for the judges of their choice." Def. Exh. 9. S.B 656 was enacted as S.L. 2017-214 after the Senate and House overrode Governor Cooper's veto. Pl. Exh. 2.

20. S.L. 214 also made a number of changes to judicial elections in 2018. As a result, in 2018 judges will be elected through a process substantially different from historical practice and from the election process for other non-judicial partisan races.

21. Specifically at issue in this case, § 4(a) of S.L. 214 eliminated party primaries for state judicial offices (i.e., district court, superior court, and appellate court judges and justices) for the 2018 elections only. *See* S.L. 214 § 4(a). Primaries were not eliminated for any non-judicial elections. *See generally* S.L. 214.

22. For judicial races, all candidates will appear only on the general election ballot, and the candidate who receives the most votes for a given office in the general election will win. S.L. 214 §§ 4(a), 4(k). The elections are partisan, so a candidate's party affiliation will be listed on the ballot. S.L. 214 § 4(b).

23. S.L. 214 also affects the candidacy filing period: candidates for judicial offices are to file their notice of candidacy between June 18 and June 29, 2018. S.L. 214 § 4(a).

24. Access to the ballot as a candidate is significantly more open for judicial candidates than for other races. Unaffiliated candidates in non-judicial elections must file petitions signed by a certain number of registered voters before they qualify to be placed on the ballot. S.L. 214, § 2(a).[6] But judicial candidates unaffiliated with a

---

[6] For example, to be placed on the ballot in a non-judicial statewide race, an unaffiliated candidate must file a petition supporting their candidacy that is signed by a number of qualified voters equal to 1.5 percent of the total number of voters who voted in the most recent general election for Governor. S.L. 214, § 2(a). Additionally, the petition must contain at least 200 signatures from no less than three North Carolina congressional districts. *Id.*

9

party can file without meeting the petition requirement. S.L. 214, § 4(b), (d).[7] As is relevant here, such a judicial candidate need only file a notice of candidacy with the State Board and verify unaffiliated status.[8]

25. Judicial candidates self-select their party affiliation. Doc. 103 at 24. S.L. 214 permits a judicial candidate to change party affiliation immediately before filing for office. *Id.*; S.L. 214 § 4(b) (containing no minimum requirements for party affiliation for judicial elections in 2018).[9] Thus, for example, a candidate could change from Republican or Unaffiliated to Democrat on the day of filing, and the candidate would then be listed on the ballot as a Democrat. Doc. 103 at 24. Candidates for other offices must be registered as affiliated with a particular party for at least 90 days before they file to run as a member of that party. N.C. Gen. Stat. § 163A-973 (West, Westlaw through S.L. 2018-2).

26. In the portion of the ballot for judicial elections, the word "Democrat" or "Republican" beside a candidate's name does not mean that the candidate is the

---

[7] Counsel for the State Board confirmed this at the January 25, 2018, hearing on the motion for preliminary injunction.

[8] There are other requirements, such as paying a filing fee, complying with campaign finance disclosure rules, and, for superior or district court positions, residency requirements. *See, e.g.,* S.L. 214, § 4(d), (g), (h); N.C. Gen. Stat § 163A-187 (West, Westlaw through S.L. 2018-2); N.C. Gen. Stat. § 163A-1418 (West, Westlaw through S.L. 2018-2); *see also* N.C. State Bd. of Elections & Ethics Enf't, Guide for Candidates for Judicial Office in 2018 (Nov. 21, 2017), http://www.ncsbe.gov/Portals/0/Documents/CandidateGuideJudicialOffice2018.pdf (last visited 6/22/2018).

[9] Counsel for the State Board of Elections confirmed this interpretation of S.L. 214 at the January 25, 2018, hearing on the motion for preliminary injunction. *See also* N.C. State Bd. of Elections & Ethics Enf't, Guide for Candidates for Judicial Office in 2018, *supra* n. 8.

party's standard bearer or nominee. *See* Doc. 103 at 45–46, 69. By contrast, in the portion of the ballot for all other elections, the word "Republican" or "Democrat" next to a candidate's name means that members of the party selected the candidate at the primary election,[10] unless there was only one candidate from a party. Doc. 103 at 45. Under N.C. Gen. Stat. § 163A-983, if only one self-identified Democrat files to run for a particular office (judicial or otherwise)—i.e., if that candidate is unopposed— then she would go straight to the general election ballot with a self-identified party label, and the party would have no say in the process and no opportunity to defeat that candidate before the general election.

27. There is no limit on the number of candidates who may file for a particular judicial office for the 2018 general election, Doc. 103 at 29–30 and 46, and there is no mechanism for reducing the number of candidates who will appear on the general election ballot.

28. Even if a political party establishes its own mechanism to nominate or endorse a candidate, there is no mechanism for that information to be communicated on the ballot. Doc. 103 at 31.

---

[10] A few days before trial, the General Assembly passed a bill that would inform voters that no judicial primaries were held and that candidates self-identified their party preference. Def. Exh. 34 (S.B. 486, 2017-2018 Sess. (N.C. 2018), at §§ 2(b), (c), (e)). S.B. 486 would print the following language on the ballot above all judicial races: "No primaries for judicial office were held in 2018. The information listed by each of the following candidates' names indicates only the candidates' party affiliation or unaffiliated status on their voter registration at the time they filed to run for office." *Id.* (S.B. 486, § 2(c)). As of the date of the trial, the Governor had not signed or vetoed this bill, and neither party referenced this particular provision at trial.

29. As a result of these changes, all candidates for judicial office will appear on the general election ballot. For each race, the ballot will show the political party or unaffiliated status that the candidate chose. There is no majority-vote requirement, so if multiple candidates file it is entirely possible, even likely, that a candidate with only a plurality of the votes will win. *See* S.L. 214, § 4(k); *see also* Def. Exh. 17 at 6 and Def. Exh. 18 at 16–17.

30. The filing period for all non-judicial races, including for candidates seeking district attorney positions, was in February 2018. *See* Doc. 103 at 126, 131.

31. A primary election for non-judicial races, including races for district attorney positions, was held on May 8, 2018. *See id.* at 131, 141.

32. The general election will be held on November 6, 2018.

**Legislative History of S.L. 214/S.B. 656**

33. When S.B. 656 was first introduced in April 2017, it did not eliminate judicial primaries. Doc. 103 at 125–26. On October 4, 2017, a Proposed Conference Committee Substitute added § 4(a), which would have eliminated primaries for judges and district attorneys for the 2018 election cycle. Doc. 103 at 126; Pl. Exh. 2. On October 5, the General Assembly amended the Proposed Conference Committee Substitute Bill for S.B. 656 to restore primaries for the election of district attorneys. Doc. 103 at 126–27; Def. Exh. 2. That same day, S.B. 656 as amended was ratified and sent to the Governor. Doc. 103 at 127; Def. Exh. 2.

34. Even after S.B. 656 reinstated primaries for district attorneys, the General Assembly has continued to look at revising the prosecutorial districts. Doc. 103 at 131–32.

12

Some of the proposed maps in H.B. 717, the redistricting bill under consideration in 2017 and 2018, would affect both prosecutorial and judicial districts. *Id.; see also supra* ¶ 17.

## 2018 Judicial Races

35. There are between 140 and 150 judicial seats up for election in 2018. Doc. 103 at 28.

36. Four of these judicial seats are on the appellate courts. *Id.*

37. Although the exact breakdown is not in the record, at least one supreme court race, three court of appeals races, more than 30 superior court races, and more than 115 district court races will be on the 2018 ballot. Pl. Exh. 56 at 11 (statement by Representative John during floor debate). The appellate races will appear on the general election ballot statewide, while the superior and district court races will appear on local ballots according to their judicial district.

## The effects of Section 4(a) of S.L. 214 on the associational rights of the plaintiffs

38. As a result of S.L. 214's cancellation of the judicial primary in 2018, the plaintiffs have no ability to exclude or attempt to exclude candidates who have self-identified as Democrats from the general election ballot, they cannot nominate a ballot candidate for any judicial seat, and if they choose to endorse or nominate through a non-ballot process they cannot ensure or attempt to ensure that their chosen candidate will be the only self-identified Democratic candidate on the general election ballot. This will affect the ability of the plaintiffs to promote their party goals, beliefs, and values, especially in light of the new provision allowing candidates to change parties

13

immediately before filing instead of requiring a 90-day registration period. *See Cal. Democratic Party v. Jones*, 530 U.S. 567, 574–75 (2000) (pointing out the importance of the ability to exclude those who do not share party goals and beliefs).

39. The lack of a primary or other ballot-nominating process will cost the plaintiffs money and divert resources from other races. State and county Democratic Parties will have to expend time and money to decide whether to develop new one-time procedures for nomination or endorsement and to implement their chosen procedures, all within a short time frame. *See* Doc. 103 at 25–29, 50–53. While the plaintiffs have had several months to develop such a process for state-wide races, *see infra* at ¶¶ 45 and 47, this has been almost impossible at the trial court level because of the shifting legislative landscape. *See infra* at ¶ 48. Because S.L. 214 "cut in half" the ability of many individual judicial candidates to raise funds, Doc. 103 at 32–33 (discussing the state law cap for campaign contributions, how the "clock resets" after the primary, and when a candidate can again begin to raise money), the North Carolina Democratic Party will have to "raise more funds and expend tremendous sums" to make up for funds that individual candidates would otherwise have raised in multi-candidate races. *Id.* at 33. Such resources will be diverted from other races or efforts.

40. S.L. 214 has no minimum time requirement for party affiliation. This increases the chance a candidate will be a 'ringer.' Absent a primary or other process that winnows down candidates on the general election ballot, the plaintiffs have no way to attempt to prevent persons who do not actually support the party's aims from appearing on the

14

general election ballot with the party designation of the plaintiffs. *See Bullock v. Carter*, 405 U.S. 134, 145 (1972) (noting the state's interest in protecting the integrity of its political processes from frivolous or fraudulent candidacies).

41. The lack of a primary or some other winnowing process will likely result in some voter confusion as voters will be unable to determine which candidate is actually the Democratic Party choice. *See* Doc. 103 at 69. Voter confusion often results in lower turnout, especially in election years with no presidential, senatorial, or gubernatorial races on the ballot like in 2018. *Id.* at 70, 73. It also results in voters deciding not to vote all the way down the ballot, further reducing electoral participation. *Id.* at 71; *see also Bullock*, 405 U.S. at 145 (noting the state's interest in avoiding voter confusion and overcrowded ballots). It makes it harder for the plaintiffs to effectively encourage straight-ticket voting. *See* Def. Exh. 1, 5, 6, and 14 (local party "slate cards"); Doc. 103 at 70–71 (noting that S.L. 214 makes it more difficult to get information about candidates to voters); Doc. 103 at 71 (indicating that confused voters will turn in their ballots without voting in all races).

42. S.L. 214 applies the same to all political parties. It treats Democrats no differently than Republicans.

43. Nothing in the law interferes with the internal governance of the parties. *E.g.*, Doc. 103 at 88 (Ms. Llewellyn admitting that the elimination of primaries does not interfere with the internal governance of the Wake County Democratic Party).

44. S.L. 214 does not interfere with or limit the ability of political parties like the plaintiffs from nominating, endorsing, or supporting particular judicial candidates.

15

Doc. 103 at 51, 84. Among other options, the plaintiffs—both at the state and county level—could a hold a convention to pick a nominee or could choose a candidate through some alternative means, such as endorsement. *See id.*

45. Because S.L. 214 passed almost 8 months ago, some 13 months before the general election, the political parties have had time and will have time to consider its effects and to develop strategies to deal with its challenges. Both the Democratic Party and the Republican Party are contemplating an endorsement process for the 2018 appellate judicial races. Doc. 103 at 25–26 (Democrats); Def. Exh. 7 (Republicans).

46. The Democratic Party has historically not taken sides or spent money on behalf of candidates during the primary process. Doc. 103 at 40–42 (noting that the Democratic Party's "policy is not to intervene in primaries[,] historically and today").

47. Because S.L. 214 abolished primaries for appellate judicial races, the North Carolina Democratic Party determined that it had "no other options" than endorsing appellate court candidates to reduce the splitting of Democratic votes and to support their preferred candidate. *See* Doc. 103 at 25–27. Candidates seeking endorsement will complete a questionnaire and submit to an endorsement interview. *Id.* at 25. The Executive Council of the North Carolina Democratic Party will then choose the nominee. *Id.* At trial, it was not clear if this endorsement process—at least for the appellate courts—would be complete before the filing period opened. *Id.* at 26.

48. At least one county Democratic Party organization considered an endorsement panel similar to what the North Carolina Democratic Party is implementing at the state level. Doc. 103 at 28–29. Because the legislature had not, as of the time of trial,

taken final action to redistrict local seats and new proposals were being put forth and acted upon, including one as recently as early June, this process had not been finalized and was disrupted by continuing legislative action. *Id.* at 29.

49. Endorsements by political parties carry at least some weight. In 2014, 19 candidates competed for a single court of appeals seat that was on the general election ballot without a primary. Def. Exh. 18 at 16–17. Although this was a non-partisan election, the State Executive Council of the North Carolina Democratic Party endorsed John Arrowood for the vacancy. Def. Exh. 13. This endorsement was featured on some sample ballots that the county Democratic Parties distributed. Def. Exh. 1; Def. Exh. 14. Judge Arrowood did not win, but he did receive the second-highest tally of votes—approximately 14 percent, compared to 24 percent for the winner. Def. Exh. 18 at 16–17.[11]

50. S.L. 214 does not prevent the plaintiffs from communicating their support for judicial candidates. The plaintiffs may still support candidates or communicate with voters through other means, including: distributing sample ballots, mailers, making phone calls, canvassing, or sending email lists to communicate a party endorsement. Doc. 103 at 84–85.

51. S.L. 214 does not prohibit advising and training candidates. *Id.* at 89. It does not prohibit managing volunteers or grass-roots support for candidates. *See id.* at 84–90.

---

[11] The Defendants' trial brief indicates that the Republican Party endorsed John Tyson, the winning candidate, Doc. 93 at 8, but they did not offer evidence to this effect at trial.

52. When S.L. 214 was enacted and as of the trial date, the filing period had not yet opened, and no one knew how many candidates would actually file for any particular judicial office. *Id.* at 61–62. While there is historical evidence of multiple candidates, Def. Exhs. 17 and 18, in the most recent statewide judicial race with no primary—which listed the party affiliation of the candidates on the ballot, like the 2018 elections will do—there was only one candidate per party and one unaffiliated candidate. Def. Exh. 19 at 9; Def. Exh. 21.

## Justifications

53. The defendants have offered three justifications for delaying judicial candidate filing and cancelling the judicial primaries: (a) providing an opportunity to review and implement judicial redistricting for superior and district court judges before the start of the 2018 election cycle for these offices; (b) providing an opportunity to analyze, debate, and present potential constitutional amendments about changes to judicial term length and the manner of selection of judges in North Carolina that could take effect in 2018 if adopted; and (c) avoiding voter confusion and inconsistency related to holding primaries for some but not all judicial races.

54. All Republican legislators have stipulated that they will refuse to answer any question in court "about the origin, drafting, revision, history, enactment, purpose[,] and justification" for the elimination of judicial primaries on the grounds of legislative privilege. Doc. 75 at ¶¶ 2–3.

55. The legislative history indicates—and all parties agree— that at the time S.L. 214 was enacted the General Assembly's stated purpose for cancelling primaries was to

provide the legislature with more time to consider legislation redrawing the boundaries of existing judicial superior and district court districts, and the Court so finds. Legislation to redistrict these seats had been introduced in the House earlier in 2017, and a committee was appointed to study the matter early in the fall of 2017. Pl. Exh. 2. During floor debate in October on S.B. 656, the bill that became S.L. 214, the representative who moved to pass the bill over the governor's veto stated that the reason judicial primaries were abolished was so the legislature could "take our time" in redistricting judicial seats and "get it right." Pl. Exh. 56 at 8 (statement by Representative Lewis); *see also* Pl. Exh. 56 at 10 (statement by Representative Lewis during floor debate that no redistricting was contemplated for appellate judicial races). This was the only the justification that the defendants raised before this Court issued a preliminary injunction in January of 2018. Doc. 45 at 7–8.

56. Some legislators in the General Assembly were informally considering efforts to initiate a constitutional amendment to alter the method of selection of judges in October 2017 when S.L. 214 was enacted into law. *See* Def. Exh. 9 (Governor Cooper's Veto Message asserting that S.B. 656 "is the first step toward a constitutional amendment that will rig the system so that the legislature picks everybody's judges in every district instead of letting the people vote for the judges they want"); Doc. 103 at 151; Def. Exh. 35 (Rep. Morey's draft declaration stating that S.B. 656 had a dual purpose: buying time to see if the Senate passed H.B. 717 and if the legislature approved a constitutional amendment for the merit selection of judges in January 2018). A few months after S.L. 214 passed, the Senate Select

19

Committee on Judicial Reform and Redistricting stated in a letter to a Senate Berger that it had "met over the past two months to consider the important issues of how North Carolina selects its judges and whether changes are needed to the state's existing judicial districts[,]" Def. Exh. 8, which tends to indicate that judicial selection methods were at issue at or soon after the time S.L. 214 was passed.

57. After the fact and just a few days before trial, the General Assembly passed a bill that included language stating it had enacted S.L. 214 "to allow for more time to thoughtfully consider" judicial redistricting and the forms of judicial selection. Def. Exh. 34 (S.B. 486, 2017-2018 Sess., at § 2(a)).

58. At the time S.L. 214 was enacted, no bill had been introduced to submit to the voters for their approval any constitutional amendment altering the method of selection of members of the judiciary effective with the 2018 elections. Doc. 103 at 131. No such bill has been introduced since. *Id.*

59. Other than the fact that S.L. 214 treats all judicial races the same, *see* S.L. 214, § 4(a) (cancelling primaries for all judicial races), there is no explicit or direct evidence from the time the bill was under consideration and enacted that the legislature decided not to have primaries for statewide appellate races—which were not subject to redistricting—in order to be consistent as to all judicial races. After the fact, the General Assembly passed a bill including language "that all elections for judges in 2018 were to be treated uniformly under S.L. 2017-214, the Electoral Freedom Act of 2017, while [changes to judicial redistricting and forms of judicial selection] were considered." Def. Exh. 34 (S.B. 486, § 2(a)).

## III.    LEGAL PRINCIPLES

"The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997), and to independently express their political views as a party.  *Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n,* 518 U.S. 604, 616 (1996).  Thus, political parties and their adherents "enjoy a constitutionally protected right of political association." *Democratic Party of U. S. v. Wis. ex rel. La Follette*, 450 U.S. 107, 121 (1981).  The government, structure, and activities of political parties enjoy constitutional protection, *see Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 230 (1989) (noting political party's "discretion in how to organize itself, conduct its affairs, and select its leaders"), and the Supreme Court has regularly recognized the interests of political parties in ballot access and other election-related issues.  *See, e.g., Timmons*, 520 U.S. at 363 (identifying burden prohibiting "fusion" designation on ballot as "not trivial").

"It is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons,* 520 U.S. at 358.  "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown,* 415 U.S. 724, 730 (1974).  The Constitution grants broad powers to the states to prescribe the time, place, and manner of

elections for state offices. *Tashjian v. Republican Party of Conn.,* 479 U.S 208, 217

(1986).

Thus, not every burden on a political party's preferences constitutes a burden on

the right of association, and not every burden on the right of association is

unconstitutional. *See Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983) (noting that

no "litmus-paper test" separates acceptable from unacceptable restrictions given that

substantial regulation of the electoral process is necessary); *see also Gill v. Whitford*, No.

16-1161, 2018 WL 3013807, at *15 (U.S. Jun. 18, 2018) (noting in a different context

that federal courts are "not responsible for vindicating generalized partisan preferences"

in electoral regulation). When analyzing whether a state election law impermissibly

impinges on associational rights protected by the First Amendment, courts apply the

framework developed by the Supreme Court in *Anderson,* 460 U.S. 780, and *Burdick v.

Takushi,* 504 U.S. 428 (1992). *See Marcellus v. Va. State Bd. of Elections*, 849 F.3d 169,

175 (4th Cir. 2017).

As explained in *Anderson*, a court

> must first consider the character and magnitude of the asserted injury to
> the rights protected by the First and Fourteenth Amendments that the
> plaintiff seeks to vindicate. It then must identify and evaluate the precise
> interests put forward by the State as justifications for the burden imposed
> by its rule. In passing judgment, the Court must not only determine the
> legitimacy and strength of each of those interests; it also must consider the
> extent to which those interests make it necessary to burden the plaintiff's
> rights. Only after weighing all these factors is the reviewing court in a
> position to decide whether the challenged provision is unconstitutional.

460 U.S. at 789. Not all restrictions are subject to strict scrutiny. *Burdick*, 504 U.S. at

432. Rather, the "rigorousness" of the inquiry "depends upon the extent to which a

challenged regulation burdens First and Fourteenth Amendment rights." *Id.* at 434. Laws imposing "severe" restrictions must be "narrowly drawn to advance a state interest of compelling importance," *id.*, while an election provision that "imposes only reasonable, nondiscriminatory restrictions upon . . . First and Fourteenth Amendment rights" is generally justified by "the State's important regulatory interests." *Id.*; *accord Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451–52 (2008).

Thus, when applying the *Anderson–Burdick* analysis, courts consider first "the character and magnitude" of the burden that the challenged provision imposes on associational rights. *Marcellus*, 849 F.3d at 175. Courts then evaluate that burden in light of the reasons proffered by the state in justification of the burden. *Wash. State Grange*, 552 U.S. at 451–52.

None of the parties have identified another state that elects officials using only a general election regardless of the number of candidates. As best the Court can tell, the relevant Supreme Court cases discussing relevant associational rights all arise in the context of election systems that involve primaries or other methods restricting access to the general election ballot. These cases tend to be directed toward the state's interests in regulating elections and not the state's interests in holding a general election without any such restrictions. And, of course, the fact that a state has a legitimate interest in regulating the numbers of candidates on the ballot does not necessarily mean that the state must so regulate.

While no Supreme Court precedent is directly controlling, there are several cases providing some guidance. In *California Democratic Party v. Jones*, the Supreme Court

23

emphasized the importance of the primary election in a case challenging a California law prohibiting political parties from excluding non-party members from voting in their primaries. 530 U.S. 567 (2000). In finding that this statute violated the associational rights of a political party, the Court noted that "in no area is the political association's right to exclude more important than in the process of selecting its nominee" and that the nominating process is "the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." *Id.* at 575.

In *Washington State Grange v. Washington State Republican Party*, the Supreme Court upheld a Washington initiative establishing a "top two" primary where candidates were permitted to identify themselves on the ballot by their party preference regardless of whether they were endorsed by or were even members of that party because the statutory system did not require party nomination and there was nothing to indicate the candidates would be designated as the party's nominees. 552 U.S. at 447–59. The Court further held that a political party has no First Amendment right to designate its nominee on the general election ballot. *Wash. State Grange*, 552 U.S. at 453 n. 7. And in *Timmons v. Twin Cities Area New Party*, where a minor political party challenged a "fusion ban" prohibiting an individual from appearing on the ballot as a candidate of more than one party, the Court recognized that the associational right at issue was "not trivial," but was "unpersuaded" that the party "has a right to use the ballot itself to send a particularized message, to its candidate and to the voters, about the nature of its support for the candidate." 520 U.S. at 363.

24

Finally, while primaries of one sort or another are the usual means for winnowing down the candidates in modern elections and have historically been the method used in North Carolina, there are other methods. For example, in *New York State Board of Elections v. Lopez Torres*, the Supreme Court upheld a nominating process for judicial candidates involving party conventions against an individual candidate's challenge. 552 U.S. 196, 202–07 (2008); *see also, e.g.*, *Miller v. Brown*, 503 F.3d 360, 362 (4th Cir. 2007) (explaining other methods of nomination available in Virginia).

It is clear from *Washington State Grange* that the plaintiffs here have no absolute right to use the general election ballot to identify the party's nominee for a judicial office. It is clear from *Lopez Torres* and other cases that a primary election is not the only way a state can constitutionally reduce the number of candidates for the general election and, thus, that political parties cannot demand that states choose the winnowing-down method that the political parties prefer.

On the other hand, all of these cases, particularly *Washington State Grange*, support the view that political parties do have associational rights that are burdened by potentially confusing ballots with multiple candidates claiming to be representatives of the party and by a system, like the one at issue here, that allows candidates to decide what party affiliation will be listed on the ballot. *See Wash. State Grange*, 552 U.S. at 451–52 (noting that the litigants' disagreement was only as to severity of the burden, not the fact of the burden or the existence of the parties' associational rights); *Jones,* 530 U.S. at 575–76 (emphasizing the importance of parties' ability to select their candidate); *Timmons*, 520 U.S. at 363 (identifying ban on "fusion" candidate ballot designation as "not trivial").

Finally, this is a facial challenge to S.L. 214. The Supreme Court has made clear that in challenges to changes to an electoral system, "a plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the Act would be valid, *i.e.,* that the law is unconstitutional in all of its applications." *Wash. State Grange*, 552 U.S. at 449. Further, "[i]n determining whether a law is facially invalid, [courts] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* at 449–50.

## IV. ANALYSIS

The plaintiffs contend that § 4(a) of S.L. 214 infringes on their associational rights in a number of different ways, all of which are related to the abolishment of the primary election in what are now partisan judicial races. The defendants contend that the associational rights of the plaintiffs are not burdened, or, if they are, that the burdens are not severe.

Taken together, the accumulated effects of § 4(a) of S.L. 214 burden the plaintiffs' associational rights. In partisan elections, political parties have a strong interest in identifying one candidate on the general election ballot to serve as the party's standard-bearer in that particular race. *See Jones*, 530 U.S. at 575–76. The plaintiffs will have to spend time and money educating voters on the meaning—and lack of meaning—of the political party designations on the ballot. *See id.* at 574–75 (pointing out the importance of the ability to exclude those who do not share goals and beliefs); Doc. 103 at 33 (noting that the NCDP will have to raise and expend "tremendous sums" that it would not otherwise have needed to raise). Because cancelling primaries also affects individual

candidates in their ability to raise funds due to state campaign finance laws, *id.* at 32–33, parties are more likely to need to spend money in the general election to support their chosen candidates. Because S.L. 214 removes the minimum time requirement for party affiliation before filing as a judicial candidate and does away with the primary, persons who do not support the party's aims are more likely to appear on the general election ballot as an individual affiliated with the party. Doc. 103 at 70 (explaining that there is no mechanism for indicating a party's nominee or endorsed candidate on the ballot); *see also Jones*, 530 U.S. at 572, 578–79 (discussing risks from raiding and malicious crossover voting); *Bullock*, 405 U.S. at 145 (discussing risks of fraudulent candidates). Because a judicial candidate's self-identified party affiliation will appear next to her or his name on the ballot, if more than one candidate files as a Democrat then voters will be unable to determine which candidate is actually the Democratic Party's choice. Doc. 103 at 69; *cf. Bullock*, 405 U.S. at 145 (noting, *inter alia,* the state's interest in avoiding voter confusion from overcrowded ballots). Consequently, the plaintiffs will be forced to implement an endorsement process—or some other method of nomination—to support their preferred candidates. *See* Doc. 103 at 25. This goes against the North Carolina Democratic Party's longstanding policy of allowing Democratic Party voters, not party leaders, to select the party nominee. *Id.* at 40–41. Finally, at the time S.L. 214 was enacted, neither the Republican Party nor the Democratic Party had procedures in place to deal with the associational fallout from an unexpected wholesale abolishment of primaries in judicial elections.

However, the burden on the interests of the political parties is not severe.  No political party has a right to have its nominee listed as such on the general election ballot.  *Wash. State Grange*, 552 U.S. at 453 n. 7.  S.L. 214 is politically neutral:  it applies equally to all recognized political parties.  *See* Pl. Exh. 1; *see* Def. Exh. 7.  Section 4(a) of S.L. 214 does not affect the ability of the plaintiffs to choose, support, or endorse a candidate or to disavow candidates who claim affiliation but do not share the party's goals.  *See Eu*, 489 U.S. at 224 (severe infringement where political parties barred from endorsing and opposing candidates); s*ee also Timmons*, 520 U.S. at 361 (noting that the "New Party remains free to endorse whom it likes, to ally itself with others, to nominate candidates for office, and to spread its message to all who will listen").  The plaintiffs may still hold a convention or endorse a candidate through other means.  Doc. 103 at 49–50.  They may distribute sample ballots, make phone calls, canvass, or send email lists to communicate a party endorsement or to support or oppose a particular candidate.  *See* Doc. 103 at 84–85.  S.L. 214 does not compel the party to associate with voters of another party.  *See Jones*, 530 U.S. at 577 (party forced to associate with rival party members for the nomination of it candidates).

Nor does § 4(a) of S.L. 214 regulate the parties' internal decision making.  *Timmons*, 520 U.S. at 360 ("*Tashijan* and *Eu* involved regulation of political parties' internal affairs and core associational activities").  It does not prohibit—nor does it require—political parties like the plaintiffs from endorsing, nominating, advocating for, or otherwise supporting candidates who self-identify as Democrats on the ballot.  Similarly, the plaintiffs are free to oppose judicial candidates—including those who self-

28

identify as Democrats—who hold views antithetical to those of the plaintiff political parties. While the abolishment of judicial primaries has caused the plaintiffs and other parties to contemplate changes to their procedures, that fact alone is not a burden. No political party has a unilateral associational right to maintain election systems as they are merely out of a desire to avoid the costs of change. *See Gill*, 2018 WL 3013807, at *15 (noting in a different context that federal courts are "not responsible for vindicating generalized partisan preferences"). That the North Carolina Democratic Party's procedures for change require more time than is available before the General Election is not attributable to the defendants or to § 4(a) of S.L. 214; instead, it is attributable to choices the State Party made about how it wants to manage the process of changing its rules, procedures, and policies.[12]

While § 4(a) may result in two or more candidates who self-identify as Democrats on the general election ballot without giving the party an opportunity to use its resources during the primary to defeat any frivolous or fraudulent candidates, the evidence shows that the plaintiffs have not historically "taken sides" during primaries. *See* Doc. 103 at 40–41 (noting that the Democratic Party's policy "is not to intervene in primaries[,] historically and today"). And nothing prevents the plaintiffs from recruiting "real" Democrats to run, which would prevent the problem of a ballot with only a self-identified

---

[12] Several witnesses for the plaintiffs testified generally that the abolishment of primaries in 2018 affected the plaintiffs' internal decision-making. However, the only specific decision they identified was the need to develop new procedures to deal with the cancelled primaries. Doc. 103 at 24–29, 33–38, 88.

Democratic "ringer." Finally, because the filing period closes in late June, the plaintiffs will have more than four months to choose and muster support for their chosen candidates before the general election.

Specifically as to appellate judicial races, the last appellate race with no primary did not have multiple candidates from each party. Def. Exh. 19 at 9; Def. Exh. 21. Only three candidates ran: one Democrat, one Republican, and one unaffiliated candidate. Def. Exh. 19 at 9. In that race—as with the upcoming 2018 judicial elections—partisan designations for judicial candidates were listed on the general election ballot. Def. Exh. 21. Thus, it is not certain that confusion will be widespread. Both parties appear to be in the process of implementing a way to select an endorsed candidate and to endorse before the filing period begins. Doc. 103 at 25–26 (Democrats); Def. Exh. 7 (Republicans). Thus, they are taking steps to speak with one voice, to select their own candidate, and to reduce the possibility of multiple candidates from each party.

As to judicial races for trial judges, as of the date of trial the legislature was continuing to work on redistricting for trial judges. With the June 18 to June 29 filing period fast-approaching, this made it very difficult if not impossible for local county Democratic parties to know when they needed to recruit candidates and when they needed to discourage candidates. And it made it virtually impossible for the local parties to establish and implement a meaningful pre-filing-period endorsement process—even if the legislature makes no changes in judicial districts. *See* Doc. 103 at 28–29 (reflecting the difficulties one county-level plaintiff had implementing an endorsement panel given the changing legislative landscape). On the other hand, there is no evidence as to the

30

likelihood of multiple candidates on the ballot for any particular local judicial race or as to the number of races in any particular judicial district under current law, so it is difficult to predict that confusion about party affiliation or confusion resulting from many multi-candidate races will be widespread or significant. It is thus not at all clear that lack of time to develop a pre-filing-period endorsement process is a significant burden.

The Court thus concludes that the burden on the associational rights of the plaintiffs is small. When a law places only a modest burden on association rights, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons*, 520 U.S. at 358; *see also Wash. State Grange*, 552 U.S. at 451–52. States "may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons,* 520 U.S. at 358. But it is the legislature, not the courts, who are responsible for those regulations. While the courts can review those regulations for constitutional violations, courts do not substitute their own judgment for how to weigh the costs and benefits of particular electoral regulations. *See Storer*, 415 U.S. at 729–30 (observing that states have broad but not unlimited power to regulate the time, place, and manner of elections because of their interest in the fair, honest, and orderly conduct of elections).

Here, the defendants contend that three governmental interests justify abolishing judicial primaries in 2018: (1) giving the legislature time to redistrict so the 2018 election can be conducted under the new districts, (2) giving the legislature time to consider and implement changes to judicial selection for the 2018 election, and (3)

reducing voter confusion that would result from inconsistency related to holding primaries for some but not all judicial races in 2018.[13]

The evidence is strong that the legislature's decision to abolish primaries in 2018 was based on its desire to examine and adjust judicial districts before the 2018 election. Because district and superior judges are elected from particular districts, the legislature could reasonably conclude that it was likely enough to enact new boundaries for such districts this year that the normal filing period and primary dates were not workable. Certainly the legislature has a legitimate interest in seeing its decisions implemented as soon as is reasonably possible.

While the General Assembly's most clearly articulated reason for cancelling the judicial primaries—gaining more time for redrawing superior and district court lines—does not apply to appellate judicial races,[14] and while there is no credible direct evidence that the legislature affirmatively decided to include appellate races in the prohibition out of a desire to reduce confusion that might result from subjecting different judicial races to different electoral processes, it is undisputed that the legislature did in fact treat all judicial races the same. *See Storer*, 415 U.S. at 730, 736 (noting that states have a legitimate interest in administrative efficiency in the elections process). This is a

---

[13] At trial, the parties agreed that the Court should consider only the General Assembly's justifications for S.L. 214 as of the time the bill was enacted, not any justification that may have come to pass later. *E.g.*, Doc. 103 at 205–06, 227.

[14] As noted *supra*, appellate judges are, by constitutional requirement, elected statewide. N.C. Const. art. IV, § 16.

legitimate concern and nothing has really changed in this regard since the Fourth Circuit

decided that the plaintiffs' evidence on the merits was insufficient to justify a preliminary

injunction. *See Berger*, 717 F. App'x at 307–08 (Motz, J. concurring) (noting in this case

the state's legitimate interest in consistency in judicial elections); *see also Munro v.*

*Socialist Workers Party*, 479 U.S. 189, 195–95 (1986) (reasoning that the state was not

required to make a "particularized showing" of the interests alleged to support its law

because requiring such proof would lead to "endless court battles" over the sufficiency of

the state's evidence).[15]

Taken together, these two justifications are sufficient to outweigh, on a facial

challenge, the modest burdens that a one-time cancellation of judicial primaries imposes

on the associational rights of the plaintiffs.[16]  The lack of a primary or other mechanism

for reducing candidates applies only for the 2018 election and there is no evidence

tending to show that any particular local general election ballots will be overwhelmed

with numerous multi-candidate races so that confusion will be certain to affect the

_____

[15] The plaintiffs contend that one of the legislature's justifications—buying time to revise the judicial districts—is undermined because the legislature did not also cancel the primary elections for district attorneys even though prosecutorial districts were also under consideration for revision.  However, the plaintiffs have not explained how a policy decision treating judicial and non-judicial elections differently violates their associational rights.  Nor have the plaintiffs directed the Court to any case law supporting their implicit contention that on this kind of record the Court should evaluate the truthfulness of the legislature's explicitly stated purpose.

[16] Given these two legitimate concerns, the Court need not address the third justification that the defendants proffered at trial: that the legislature was considering changes to the method of judicial selection.  The evidence that this was the real reason for the act is weak, and the Court declines to wade into the difficult question of determining legislative intent in the face of a virtually silent record.  The defendants' other reasons, one of which is supported by strong evidence from the time the law was enacted, are sufficient to support the minor intrusion on the associational rights of the plaintiffs.

associational rights of the plaintiffs. Similarly, nothing in S.L. 214 prevents county-level party organizations from endorsing candidates or from communicating with voters about their chosen candidates. While § 4(a) and the legislature's delay in finalizing redistricting have made it virtually impossible for the local plaintiffs to undertake any meaningful associational activity to reduce competition between Democrats in the general election and have made it impossible for their standard-bearer to be identified as such on the ballot, these facts had not occurred and were not known at the time the law was enacted and are only marginally relevant, if that, to a facial challenge. In any event, the plaintiffs will have several months to work in favor of their chosen candidates between the filing period in June and the election in November. While § 4(a) of S.L. 214 does prevent the plaintiffs from attempting to defeat "fake Democrats" in a primary, it is not clear that this problem will happen often, and the possibility of such problems is insufficient to support a facial challenge. Similarly, the possibility that there will be voter confusion that will affect the plaintiffs' associational rights is not certain or widespread enough to support a facial challenge. *See Wash. State Grange*, 552 U.S. at 449–50 (reminding courts not to consider "hypothetical or imaginary cases" when evaluating facial challenges to election laws based on burdens on associational rights).

Appellate judicial races will lead the statewide ticket in 2018, [17] giving them increased importance and heightening the associational rights at issue. Moreover, for

---

[17] The Court takes judicial notice that the governor, the lieutenant governor, and the Council of State were elected in 2016 to four year terms. N.C. State Bd. of Elections & Ethics Enf't, 11/08/2016 Official General Election Results – Statewide, http://er.ncsbe.gov/?elect ion_dt=11/08/2016&county_id=0&office=COS&contest=0 (last accessed 6/22/2018); *see also*

appellate races there is historical evidence from the 2004 and 2014 elections that without a primary there is a good chance of cluttered ballots and voter confusion in at least one, and perhaps several, races, Def. Exh. 17 at 6 and Def. Exh 18 at 16-17, which, as explained *supra*, affects the plaintiffs' associational rights.

But the evidence at trial shows that these burdens are not onerous. First, § 4(a) of S.L. 214 does not impair the plaintiffs from supporting or opposing candidates through alternative means. *E.g.,* Doc. 103 at 51, 84–85. Political parties may hold a convention or endorse a candidate through other means. *Id.* at 51, 84, 89. They may also support candidates in myriad other ways, such as: distributing sample ballots, making phone calls, canvassing, using social media, or promoting candidates in any other way that contemporary political parties employ. *See id.* at 84–88. While an endorsement may not be as effective as a primary nomination, the evidence shows that a major party's endorsement carries some weight in judicial elections. *See* ¶ 49, *supra*; c*ompare* Def. Exh. 1, 13 *with* Def. Exh. 18 at 16–17. Finally, it is also not clear that the lack of a primary always leads to a cluttered ballot in a race for an appellate judge position. In the 2016 race to fill a court of appeals seat—in which no primary was held—only one Democrat, one Republican, and one unaffiliated candidate competed for the office. Def. Exh. 19 at 9; Def. Exh. 21. Although the race was officially nonpartisan, each

---

N.C. Const., art. III, §§ 2(1), 7(1), 8. The Court also takes judicial notice that neither United States Senator is up for reelection in 2018. N.C. State Bd. of Elections & Ethics Enf't, Online Interactive Election Results, http://www.ncsbe.gov/Election-Results (election results indicating that Senator Tillis was elected in 2014 and that Senator Burr was reelected in 2016) (last accessed 6/22/2018); *see* U.S. Const. art 1, § 3.

candidate's party affiliation was listed on the ballot. Def. Exh. 21; *supra* n. 4. That only three candidates filed to run suggests that, when party affiliation is included on the ballot, the political parties may have more ability to affect which candidates run than when judicial elections were strictly non-partisan. *See* Def. Exh. 19 at 9; Def. Exh. 21. This further undermines the plaintiffs' facial challenge.

Finally, the plaintiffs have not established "that no set of circumstances exists under which [§4 of S.L. 214] would be valid." *Wash. State Grange*, 552 U.S. at 449. At the core of their case is the proposition that cancelling primaries impairs the ability of Democrats to band together to promote candidates who espouse their political views. But this rests on the assumption that multiple candidates will self-identify as Democrats, causing ballot clutter and voter confusion that will impair the associational rights of North Carolina Democrats. They have not, however, shown that this will occur in all circumstances—i.e., in each or even most of the judicial races. *See id.* There is no way to know how many candidates will run for a particular office in advance of the filing period, Doc. 103 at 61–62, and the historical evidence before the Court is limited to three appellate races. If only one candidate who has self-identified as a Democrat files to run for a judicial office, then the situation is essentially identical to a race slated to have a primary, but for which only one candidate self-identified as a Democrat files to run. In this situation, there would be no primary, the candidate would go straight to the general election ballot with a self-identified party label, and the party would have no say in this process. *See* N.C. Gen. Stat. § 163A-983 (West, Westlaw through S.L. 2018-2). In such

a situation, the concerns of the plaintiffs about voter confusion and ballot clutter will not be realized.

The evidence that multiple candidates might compete for a single appellate court seat is insufficient to prevail in a facial challenge. Doc. 103 at 33–34 (Mr. Goodwin testifying that eight candidates competed for a single supreme court seat in 2004 and that 19 candidates were on the ballot for a single court of appeals seat in 2014). While two recent races without primaries had multiple candidates, the most recent judicial race without a primary—which, unlike the earlier two races, listed each candidate's party affiliation on the ballot, like the 2018 election will do—suggests that only one candidate per party might file for a judicial election conducted without a primary. *See* Def. Exh. 19 at 9; Def. Exh. 21; *See Wash. State Grange*, 552 U.S. at 449–50 (reminding courts not to consider "hypothetical or imaginary cases" when evaluating facial challenges to election laws based on burdens on associational rights).

## V.     CONCLUSION

Because § 4(a) of S.L. 214 imposes only modest burdens on the plaintiffs' associational rights, the burdens are imposed neutrally on all political parties, the North Carolina Democratic Party and its county affiliates remain free to endorse whom they like, endorse or nominate candidates through non-primary methods, and spread their message to all who will listen, and the defendants have offered facially legitimate justifications for these modest burdens, the Court finds that the plaintiffs have not carried their burden of proof to show that S.L. 214 is unconstitutional on its face. *See Wash. State Grange*, 552 U.S. at 452 (observing that "the State's important regulatory interests

37

are generally sufficient to justify reasonable, nondiscriminatory restrictions on election procedures").  Judgment will be entered for the defendants.

      This the 25th day of June, 2018.


_____
UNITED STATES DISTRICT JUDGE